584 F.2d 437
 189 U.S.App.D.C. 279
 HOUSEHOLD GOODS CARRIERS' BUREAU and Movers' &
Warehousemen's Association of America, Inc., on
behalf of their members, Petitioners,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
National Industrial Traffic League, Intervenor.
MOVERS ROUND TABLE, Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
National Industrial Traffic League, Intervenor.
 Nos. 76-1319, 76-1550.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued April 26, 1977.
Decided June 30, 1978.
Rehearing Denied July 27, 1978.
 
 Russell S. Bernhard, Washington, D. C., for petitioners in No. 76-1319.
 Thomas R. Kingsley, Washington, D. C., for petitioner in No. 76-1550.
 Walter H. Walker, III, Atty., I. C. C., Washington, D. C., with whom Mark L. Evans, Gen. Counsel, Charles H. White, Jr., Associate Gen. Counsel, I. C. C. and Lloyd John Osborn, Atty., Dept. of Justice, Washington, D. C., were on brief, for respondents. Arthur J. Cerra, Gen. Counsel, I. C. C., Washington, D. C., at the time the record was filed, also entered an appearance for respondent, I. C. C.
 Renee D. Rysdahl, John F. Donelan and Frederic L. Wood, Washington, D. C., were on brief for intervenor.
 Before MacKINNON, ROBB and WILKEY, Circuit Judges.
 Opinion for the Court filed by ROBB, Circuit Judge.
 Concurring opinion filed by MacKINNON, Circuit Judge.
 Opinion filed by WILKEY, Circuit Judge, concurring in part and dissenting in part.
 ROBB, Circuit Judge.
 
 
 1
 The petitioners are organizations representing interstate carriers of household goods. They petition for review of an order of the Interstate Commerce Commission amending its rules governing carrier liability for loss and damages to the goods they carry. Practices of Motor Common Carriers of Household Goods (Limitation of Liability), 124 M.C.C. 395 (1976), Modified May 26, 1976. The challenged portions of the order prohibit carriers from including in their bills of lading any provision absolving the carrier of liability for loss or damage to undeclared items of extraordinary value or to certain fragile items packed by the shipper. The order also prohibits carriers from requiring certain shippers to assume the risk of loss for damage caused by strikes, riots, or civil disturbances, and establishes a uniform formula to be used in settling loss or damage claims.
 
 
 2
 For the reasons set forth below, we deny the petitions.
 
 I.
 
 3
 For a number of years carriers included a provision in their bills of lading which disclaimed any liability for "items of extraordinary value" included in a shipment unless the shipper specifically declared the items in the bill of lading. In the informal rulemaking proceeding here under review, the Commission determined that carriers were using this notice provision as a means of limiting their liability in contravention of section 20(11) of the Interstate Commerce Act. Section 20(11) provides that a common carrier
 
 
 4
 shall be liable . . . for any loss, damage, or injury to . . . property caused by it . . . and no contract, receipt, rule, regulation, or other limitation of any character whatsoever shall exempt such common carrier . . . from the liability imposed . . . for the full actual loss, . . . notwithstanding any limitation of liability or limitation of the amount of recovery . . . and any such limitation, with respect to the manner or form in which it is sought to be made is declared to be unlawful and void . . .
 
 
 5
 49 U.S.C. § 20(11).
 
 
 6
 A proviso in section 20(11) permits the Commission by order to authorize "released rates" which are lower than those under which the carrier assumes full common law liability. Under the "released rates", which most carriers have established, a shipper can save money by releasing his shipment to the carrier at a value of $.60 per pound per article. For a small additional charge, but still less than the full liability rate, the shipper can release the shipment at a total value amounting to a sum not less than $1.25 times the weight of the shipment in pounds. 49 C.F.R. § 1307.201. For example, if a shipper with a quantity of household goods weighing 1000 pounds releases it at the $1.25 released rate the carrier then has a maximum liability of $1250 for loss or damage to the goods. The Commission found that in practice carriers were using the "items of extraordinary value" reservation in the bill of lading to avoid liability for some lost or destroyed items. In the example above, if the shipper had neglected to note in the bill of lading that a $4000 fur coat was included in the shipment, instead of being liable for the loss of the coat in the amount of $1250, the carrier disclaimed all liability because the coat was considered an item of extraordinary value.
 
 
 7
 The Commission found that "items of extraordinary value" is an amorphous category which carriers often interpret against the shipper. 124 M.C.C. at 415. For example, carriers have refused to pay for lost items ranging from violin bows to false teeth based upon the carrier's unilateral Post hoc determination that these were items of extraordinary value which should have been declared by the shipper. Accordingly, the Commission ruled that the practice was an unlawful attempt to limit liability.
 
 
 8
 The carriers argue that section 20(11) does not apply because they have not sought to limit their liability. Rather, the carriers claim, they have merely sought to limit the conditions under which they will accept goods for shipment. The argument exalts form over substance, for the result is to limit the carriers' liability regardless of how we characterize the limiting clause in the bill of lading. It is true that carriers may impose just and reasonable regulations relating to the acceptance of goods for shipment, 49 U.S.C. § 316(b), but the distinction between a condition on acceptance and a limitation on liability is not defined sharply. At some point, carriers can so abuse a particular condition that it operates, not as a condition on acceptance but as a limitation on liability. It is the Commission's responsibility in the first instance to determine when that point has been reached. In this case the Commission has determined that it is neither just nor reasonable for carriers to condition their liability upon the shipper's ability to identify at the outset what items in the shipment the carrier may later decide were extraordinarily valuable. The abuses revealed in the record of this rulemaking proceeding testify to the reasonableness of that decision by the Commission.
 
 
 9
 The carriers offered to cure the potential for abuse by making the notice provision in the bill of lading more specific. They proposed a list of approximately thirty items which would have to be declared as a precondition to carrier liability. The Commission found that the proposed list, which included items such as "antiques", "works of art", "hobby collections" and heirlooms", was still vague and invited abuse by the carriers. We cannot say that the Commission's rejection of this proposal was arbitrary or irrational.
 
 
 10
 The Commission rule does not require that carriers accept goods which they do not believe can be transported safely. Any carrier is free to request an exception to its certificate for items it does not desire to transport.124 M.C.C. at 415. The Commission had a choice, either to require the carriers to request such exceptions for those items which they felt they could not transport safely, or to require that shippers attempt to guess which items in their shipments were those the carrier might later determine to be of extraordinary value. The Commission selected the former alternative which in essence holds carriers to the amount of liability for which they had been paid by the shipper. We perceive nothing arbitrary or irrational in that choice. See 5 U.S.C. § 706(2)(A)-(D); National Ass'n of Food Chains, Inc. v. ICC, 175 U.S.App.D.C. 346, 351-52, 535 F.2d 1308, 1313-14 (1976).
 
 II.
 
 11
 We reject the Movers Round Table objection to the elimination of a provision in the bill of lading disclaiming liability for certain fragile goods if packed by the shipper.[1] The Commission concluded such a provision would contravene the prohibition on limitation of liability in section 20(11) and deleted it from the terms authorized for inclusion in a bill of lading. Movers Round Table argues that the Commission's action is arbitrary because it subjects carriers to liability for breakage which may be due to faulty packing by the shipper. However, a carrier need not accept improperly packed items, See Practices of Motor Common Carriers of Household Goods, 121 M.C.C. 347, 362 (1975). On the other hand, under the rule sought by Movers Round Table a shipper who packs goods perfectly might be foreclosed from recovery for damages caused by the carrier. The Commission has selected a rule affording protection for both the shipper and the carrier and we cannot say this is arbitrary or irrational.
 
 III.
 
 12
 The carriers also seek authority to disclaim liability for damage caused by strikes, riots, or other civil disturbances. Noting that at common law carriers were liable for damage from these causes the Commission determined that this additional exception to common law liability was not appropriate, and that the carrier must remain liable for damages to certain classes of goods[2] if the carrier proceeds in the face of such danger. The Commission reasoned that the carrier, rather than the shipper, usually an individual or family, is normally in the best position to determine when the shipment is about to proceed into an area of danger. Thus the Commission thought the shipper should not bear the risk of loss unless the carrier proceeds at the shipper's direction. We cannot substitute our judgment for that of the Commission in determining what exceptions to carrier liability beyond those at common law are dictated by national transportation policy. The Commission's determination is neither arbitrary nor irrational.
 
 IV.
 
 13
 Finally, we turn to the formula for determining "full actual loss" prescribed for settlements on lost or destroyed goods. The Commission's rule requires that when a carrier settles a loss claim, it shall use replacement cost as a base from which to deduct depreciation. If the item is irreplaceable, then the original cost, augmented by an inflation factor derived from the consumer price index, is used as a base. 124 M.C.C. at 416-17.
 
 
 14
 The carriers argue that no single formula can accurately apply to all damage claims, and that the chosen formula, for example, does not make sense when applied to an article which can be repaired. The argument is unsound, for the Commission made it clear that the rule applies only when a claim is settled monetarily. Carriers are still free to repair or replace lost or damaged items.
 
 
 15
 The Commission promulgated this rule in response to numerous complaints from shippers who received from carriers payments insufficient to replace lost or destroyed articles. The carriers contend that the Commission has no jurisdiction to adjudicate damage claims, that this is an issue for the courts. This argument overlooks the Commission's responsibility to establish proper and reasonable practices for the settlement of loss or damage claims. Under section 20(11) carriers are liable for the "full actual loss" suffered by the shipper. There is evidence in the record that some carriers were not fulfilling their responsibilities in this regard, but were, by unduly hard bargaining, forcing shippers to accept niggardly settlements. In view of the mandate to the Commission to promote safe, efficient service and to foster sound economic conditions in transportation, See National Transportation Policy, 49 U.S.C. Preceding § 1, 54 Stat. 899 (1940), we believe the Commission has the jurisdiction and the responsibility to establish reasonable ground rules which ensure fair treatment of shippers in the settlement of claims. The rule does not purport to adjudicate claims, nor does it attempt to specify how replacement cost or depreciation are to be determined. We find the Commission's response to the problem of inadequate settlements both rational and reasonable and entirely within its authority to regulate the industry.
 
 
 16
 Finding none of the challenged rules arbitrary or irrational, we must uphold them. The petitions to review and vacate the order of the Commission are
 
 
 17
 Denied.
 
 MacKINNON, Circuit Judge, concurring:
 
 18
 I concur in the opinion by Judge Robb[1] ; however, I desire to set forth additional reasons that lead me to affirm the Interstate Commerce Commission's (ICC) order in Practices of Motor Common Carriers of Household Goods (Limitation of Liability), 124 M.C.C. 395 (1976), As modified, May 26, 1976. This order invalidates some household goods tariff provisions, generally set forth in the contract terms and conditions of bills of lading, that in practice operate to limit the liability of the carrier for loss of or damage to certain transported articles. In particular, I refer to those tariff provisions which require shippers to list certain articles in the bill of lading.
 
 
 19
 I. LIMITING LIABILITY WITH RESPECT TO LOSS OR DAMAGE TO
 
 HOUSEHOLD GOODS OF EXTRAORDINARY VALUE
 
 20
 "Articles of extraordinary value" provisions are contained in the general rules governing the tariffs of most household goods carriers. 124 M.C.C. at 415. The uniform household goods bill of lading in existence at the time of the Commission's order[2] provided:
 
 
 21
 The carrier shall be liable for physical loss of or damage to any articles from external cause while being carried or held in storage-in-transit . . . EXCEPT documents, currency, jewelry, watches, precious stones or articles of extraordinary value which are not specifically listed on the bill of lading . . ..
 
 
 22
 121 M.C.C. 347, 375 (J.A. 139), Cited at 124 M.C.C. 408. One of the "typical" tariff provisions which was considered by the ICC was contained in the Household Goods Carriers' Bureau, Tariff No. 151-B, MC-I.C.C. No. 167, issued March 21, 1973. Item 220 thereof, entitled Articles Not Accepted, prescribed the following conditions:
 
 
 23
 Unless otherwise provided, the following property will not be accepted for shipment: bank bills, coins or currency, deeds, notes, drafts or valuable papers of any kind, credit cards, jewelry, postage stamps, trading stamps, letters or packets of letters, precious stones, or articles of peculiarly inherent or extraordinary value, precious metals or articles manufactured therefrom or perishable articles. Should such articles come into the possession of the carrier without its knowledge, responsibility for safe delivery will not be assumed.
 
 
 24
 J.A. 38. The variously-phrased requirement to list "articles of extraordinary value" was the object of the Commission's particular concern.
 
 
 25
 Following its investigation and study of the practices of the motor carriers in applying such tariff provisions, the Commission set forth certain reasons which it considered justified further regulatory action.
 
 
 26
 Many ambiguities surround the current application of what is an item of extraordinary value. It is applied after the shipment has been completed, and is often interpreted against the shipper. In view of these circumstances, we believe that the public interest is best served by the requirement that household goods carriers be fully liable, pursuant to the outstanding released rates order for all items accepted for shipment. To require prior notice of an article of unusual value is not feasible. Often times it is after a claim arises that a carrier asserts that the disputed item is one of extraordinary value.
 
 
 27
 124 M.C.C. at 415. The Commission also stated:
 
 
 28
 A consideration of the statements filed subsequent to our entering of the interim report, however, reinforces our conclusion that certain provisions in the tariffs of household goods carriers which limit their liability are responsible for the carriers' failure to fully perform service in accordance with the terms of their certificates.
 
 
 29
 124 M.C.C. at 411. Thereafter, it issued the following findings:
 
 
 30
 1. Household goods carriers must amend their tariffs and bills of lading to reflect only those defenses to liability allowed by common law and by the provisions of 49 C.F.R. 1056.16 (set forth as Appendix C to the Report, 124 M.C.C. at 422); ([3]
 
 
 31
 2. A carrier must either accept full responsibility for all items transported (within the released rates provisions) or else specifically request exception from its certificate of items it does not desire to transport. . . .
 
 
 32
 124 M.C.C. at 415.
 
 
 33
 During the proceeding, the Household Goods Carriers' Bureau had proposed an amendment to the ICC regulations then under consideration.[4] This amendment would have inserted a provision in the regulations requiring a shipper to declare in writing on the shipping documents certain specified items of extraordinary value as a condition precedent to carrier liability for such items:
 
 
 34
 No liability need be assumed for loss of or damage to any article of the following kinds UNLESS such article is specifically listed on the shipping document:
 
 
 35
 bills of exchange, bonds, bullion or precious metals, currency, deed, documents, evidence of debt, credit cards, firearms, money, gems, jewelry, watches, precious stones, pearls, gold, silver or platinum articles, stock certificates, securities, stamp collections, stamps, letters or packets of letters, musical instruments of rare quality or historical significance, first editions or autographed copies of books, antique furniture, heirlooms, paintings, sculptures, works of art, and hobby collections.
 
 
 36
 124 M.C.C. at 408 n.2. The ICC specifically addressed this proposal in its May 26, 1976, order:
 
 
 37
 (S)uch a requirement is not feasible because it is not possible for a householder to identify everything he owns that is of extraordinary value or which a carrier might argue is of extraordinary value . . . instances have come to our attention for example where carriers disclaimed liability for such items as false teeth and a violin bow claiming they were items of extraordinary value . . . the proposal that household goods shippers be required to specifically list such items as precious stones, antique furniture, heirlooms, and works of art, among others, on the shipping documents . . . is not satisfactory inasmuch as such generic terms are ambiguous and subject to interpretation . . ..
 
 
 38
 J.A. 200.
 
 
 39
 The statute upon which the Commission principally relied in issuing the foregoing orders was 49 U.S.C. § 20(11), which provides[5]:
 
 
 40
 Any common carrier . . . receiving property for transportation . . .shall be liable . . . for any loss, damage, or injury to such property caused by it . . . and no contract, . . . rule, regulation, or other limitation of any character whatsoever shall exempt such common carrier . . . from the liability imposed . . . for the full actual loss, damage or injury to such property caused by it . . . notwithstanding any limitation of liability or limitation of the amount of recovery or representation or agreement as to value in any such receipt or bill of lading, or in any contract, rule, regulation, or in any tariff filed with the Interstate Commerce Commission; and any such Limitation, without respect to the manner or form in which it is sought to be made is declared to be unlawful and void . . . Provided, however, That the provisions hereof respecting liability for full actual loss, damage, or injury, notwithstanding any limitation of liability or recovery or representation or agreement or release as to value, and declaring any such limitation to be unlawful and void, shall not apply . . . to property . . . received for transportation concerning which the carrier shall have been or shall be expressly authorized or required by order of the Interstate Commerce Commission to establish and maintain rates dependent upon the value declared in writing by the shipper or agreed upon in writing as the released value of the property, in which case such declaration or agreement shall have no other effect than to limit liability and recovery to an amount not exceeding the value so declared or released . . . (Emphasis added).
 
 
 41
 These statutory provisions are the result of a long history of abuses in railroad claims litigation and practices which led Congress in 1906 to enact the Carmack Amendment (34 Stat. 593) and the two Cummins Amendments in 1915 and 1916 (38 Stat. 1197, 39 Stat. 441). In 1935 these provisions of the Interstate Commerce Act were made applicable to motor carriers by 49 U.S.C. § 319.
 
 
 42
 In view of the statutory direction of § 20(11), which basically carries forward the common law, it is evident that, except as the Commission may "expressly" authorize by the narrow statutory authority contained in § 20(11), all attempts by a carrier to limit its liability beyond the five common law exceptions recognized by 20(11) are unlawful.[6] It is thus irrelevant that a particular provision in a tariff or a bill of lading is promulgated under the general statutory authority in § 216(b) of that Act to issue "just and reasonable regulations and practices relating . . . to the manner and method of presenting . . . and delivering property for transportation . . ." (49 U.S.C. § 316(b)). This statute does not modify § 20(11) so as to authorize practices by carriers that are allegedly "just and reasonable" when such practices are prohibited by § 20(11). Congress never intended in legislating with respect to the "manner and method of presenting . . . and delivering property for transportation" to establish an additional exception to the five common law exceptions to liability embodied in § 20(11). Whenever the effect of a provision in a tariff or bill of lading is to limit a carrier's liability in contravention of § 20(11), the stated purpose and intent of § 216(b)'s provision are not sufficient to overcome § 20(11)'s prohibited effect.
 
 
 43
 The provisions in the motor carrier's tariffs and bills of lading relating to articles of extraordinary or inherent value are no exception to the foregoing rule. However, the household goods carriers contend that such provisions are just and reasonable regulations authorized by § 216(b) and that they can escape liability for lost and damaged goods on the ground that the carriers cannot be deemed to have Accepted goods for transportation unless the shipper complies with their listing requirements. The portion of the Commission's Order of May 26, 1976, quoted above, in speaking to those provisions that require shippers to list goods of "extraordinary value," concluded that the questioned provisions operate improperly to limit liability, in that ambiguous terms are used, thereby enabling a carrier to argue that the lost or damaged good was an article of "extraordinary value." Other terms found in such tariffs, such as "articles of peculiarly inherent . . . value," are even less definite and more open to varying constructions. This use by carriers of ambiguous terms provides an Indefinite standard to guide shippers of household goods, most of whom move infrequently and lack familiarity with shipping contracts. Hence, the Commission found, despite the fact that the purpose of such provisions was not completely without some justification, that the provisions were unlawful because their indefiniteness and lack of clarity made them susceptible to abuse and to being used improperly in a number of instances to limit carriers' liability in violation of § 20(11).
 
 
 44
 As for the regulation proposed by the Household Goods Carriers' Bureau, quoted above, it is my opinion that the same defects indefiniteness and abuse exist in the descriptions of articles of "rare quality," "historical significance," "antique furniture," "heirlooms," and "works of art." Each of these are imprecisely described by terms that different people interpret differently and hence are capable of abuse in the give and take of settlement discussions. Each can be used to deprive a shipper of fair compensation for a lost or damaged article.
 
 
 45
 Criticism also might be advanced of "paintings" and "sculptures," but for a different reason. These articles are present in a great many households. They may have substantial but not exceptional or peculiarly inherent value, and there is no valid reason to single them out over other household articles, such as good furniture, as requiring special disclosure under pain of not being able to recover anything for their loss or damage. Actually, the inclusion of "paintings" and "sculptures" goes further than the "value" provisions to indicate that one of the underlying purposes of such proposed regulation would be to limit the carriers' liability improperly. The "extraordinary value" provision has some justification in the contention that the carrier should be notified of items of great value in order to protect them during transit by special attention and to guard against fraudulent claims of excessive value in the event of their loss; but just putting All "paintings" and "sculptures" on the disclosure list does not even purport to have that traditional justification.
 
 
 46
 II. THE CARRIAGE OF ARTICLES THAT ARE NOT HOUSEHOLD GOODS
 
 
 47
 A number of items in the carrier's list, in my opinion, are clearly in a different category and for different reasons must be given different treatment. The "household goods" that motor carriers are certified to carry are defined by 49 C.F.R. § 1056.1 as follows:
 
 
 48
 (a) Household goods. The term 'household goods' means (1) personal effects and property used or to be used in a dwelling when a part of the equipment or supply of such dwelling; (2) furniture, fixtures, equipment, and the property of stores, offices, museums, institutions, hospitals, or other establishments, when a part of the stock, equipment, or supply of such stores, offices, museums, institutions, hospitals, or other establishments; and (3) articles, including objects of art, displays, and exhibits, which because of their unusual value require the specialized handling and equipment usually employed in moving household goods.
 
 
 49
 Under their certificates of public convenience and necessity, motor carriers of household goods are obligated to accept for transportation any article that is included within the foregoing categories. Category (1) is of particular importance to this discussion: it covers two classes of articles "personal effects," and "property used or to be used in a dwelling when a part of the equipment or supply of such dwelling." In common parlance, personal effects means effects of a personal character or property especially appertaining to one's person and having a close relationship thereto. Webster's Third New International Dictionary, 1686 (1959) defines the term as follows:
 
 
 50
 effects of a personal character: as . . . property esp. appertaining to one's person and having a close relationship thereto used in legal contexts (as wills, tariff laws) (or) such property as is usu. or normally carried by a traveler for his use and comfort used esp. in connection with insurance (or) personal property other than that employed in business used esp. in a residuary clause of a will.
 
 
 51
 Mere reference to these two categories, personal effects and property as described, indicates that the following items which the carriers' proposed regulation would require shippers to list are Not "personal effects" or "property used or to be used in a dwelling . . . etc.": bills of exchange, bonds, bullion, precious metals, currency, deeds, documents, evidences of debt, money (money and currency may be questionable depending on the amount), stock certificates, securities, gems (loose), precious stones (loose), pearls (loose), hobby collections (depending on the nature of the collection).
 
 
 52
 The intent of the Commission in formulating the household goods definition was to make it "broad enough to embrace All the property of the householder which is part of the equipment and supply of the place of abode." Practices of Motor Common Carriers of Household Goods, 17 M.C.C. 467, 473 (1939). In doing so, it did Not include the valuable documents and items set forth above. To my mind, carriers are thus not authorized under their "household goods" certification to accept or transport said articles and must reject them if they know that they are delivered to them. If they knowingly accept them, they are fully liable for their safe delivery. My reading of the Commission's brief indicates that it agrees with the foregoing. In discussing that portion of § 20(11) providing that "no contract . . . shall exempt such common carrier . . . from the liability hereby imposed . . . for the full actual loss, damage, or injury to such property caused by it," the Commission states: "This rule does not mean, however, that a carrier must accept responsibility for any item which it does not feel it can safely or properly transport, and which a shipper nevertheless manages to sneak aboard the vehicle." ICC Br. at 24. Thereafter, the Commission indicates that carriers may "request exception from its certificate of items it does not desire to transport. . . ." Id., quoting 124 M.C.C. at 415. The clear implication from these statements is that carriers may, with respect to such items, escape liability for their loss or damage.
 
 
 53
 As for those articles that are within the "personal effects" definition credit cards, firearms, jewelry, watches, letters and packets of letters, and gold, silver and platinum articles these articles, as I interpret the law, must be accepted under the carrier's certificate, and the carrier cannot require that they be separately listed under pain of excluding the carrier from liability for their safe delivery or destination.
 
 
 54
 As the Commission noted, many persons who have their household goods transported by motor carriers are not sophisticated shippers. The carriers profess to be experts in the field and most shippers understandably leave most of the chore to them. That is what the shippers pay for. The service includes loading at the house and unloading at the delivery point, and the driver usually accompanies the shipment from acceptance to delivery. With the service being so complete, shippers naturally tend to leave much to the driver. He superintends the loading and unloading, which may occupy the better part of a full day, and the shippers, husband and wife usually, in many instances would not both be there all the loading time. Occasionally, the goods may be moved without either owner present. All of this adds up to placing upon the carrier responsibility to live up to his full liability. He has a great measure of protection in the released value limitation and no claim can exceed that. If abiding by his full responsibility in the future to pay the released value on claims that have previously been improperly limited results in financial losses to the carriers sufficient to require an increase in rates, then that course should be followed. Thereby, each shipper will pay the increased cost for the increased protection that he receives.
 
 III. THE "PERISHABLES" ARGUMENT
 
 55
 The argument raised by the petitioners with respect to "perishables" also merits discussion. Petitioners contend that the Commission, in issuing its rule governing the liability of carriers for perishables included in a shipment without the knowledge of the carrier, recognized that a rule requiring shippers to disclose certain household goods lest the carrier be exempted from liability therefor is not a violation of § 20(11).
 
 The perishable regulation provides:
 
 56
 No liability need be assumed for perishable articles included in the shipment without the knowledge of the carrier; and a carrier accepting for shipment perishable articles may impose reasonable conditions necessary to insure the safe transportation of such commodities.
 
 
 57
 49 C.F.R. § 1056.16(c)(i) (J.A. 193).
 
 
 58
 Petitioners argue that there are no differences between household goods and perishables that would permit the Commission to treat them differently with respect to requiring that the shipper list them on the bill of lading. The argument is patently defective. The short and complete answer to it is that "the inherent vice or nature of the goods" since common law days, and under the present statute, has always been recognized as a basis for exempting carriers from liability for loss or damage to goods having such perishable characteristics when their presence was not disclosed or reasonably discoverable. Missouri Pacific Railroad Co. v. Elmore & Stahl, 377 U.S. 134, 137, 84 S.Ct. 1142, 12 L.Ed.2d 194 (1964); Adams Express Co. v. Darden, 265 U.S. 265, 268, 44 S.Ct. 502, 68 L.Ed. 1010 (1924). Thus, because of this substantial difference which is recognized by the common law and the regulation, the Commission may treat perishables differently with respect to requiring disclosure. Carriers, thus, may not impose a "prior notice" requirement except with respect to "perishables," with respect to goods outside the scope of their certificates, and according to the released value proviso of § 20(11).
 
 
 59
 Moreover, there is a world of difference between "perishables" and "articles of extraordinary value." "Perishables" is a more definite term, and all shippers and carriers recognize it for what it is. It is also a matter of common sense for any shipper who delivers perishables to a carrier for transportation to inform the carrier of such fact if it is not apparent in the delivery. To not inform the carrier that perishables are aboard is to assume an obvious risk of possible Certain loss in many circumstances where mere notification would obviate any loss or damage. This is not the case, however, with household goods of extraordinary value and many of the other specific items included in the carrier's list that are not perishable. Not informing the carrier of their presence does not involve the practical Certainty of loss or damage in a great many instances. In addition, non-perishable household goods are ordinarily of substantial value and for that reason are transported under substantial security precautions. Also, since the "extraordinary" value designation is "ambiguous," there is the added vice of indefiniteness the conduct prescribed for shipper compliance is not precise. For the foregoing reasons, the Commission is not required to permit carriers to treat non-perishable household goods of peculiarly inherent or extraordinary value the same as "perishables."
 
 
 60
 IV. THE "PRIOR NOTICE" AND "ACCEPTANCE" ARGUMENTS
 
 
 61
 The legislative history of the present statute makes it apparent that Congress intended thereby to prohibit carriers from limiting in any way their liability for loss, damage, or injury to transported articles whose character might be concealed by the packaging or containers in which they are shipped, except as "expressly authorized or required"[7] by the Commission.
 
 
 62
 In 1906 the Carmack Amendment to the Interstate Commerce Act reduced to statutory form the broad liability of common carriers:
 
 
 63
 That any common carrier, railroad, or transportation company receiving property for transportation from a point in one State to a point in another State shall issue a receipt or bill of lading therefor and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it or by any common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass, and No contract, receipt, rule, or regulation shall exempt such common carrier, railroad, or transportation company from the liability hereby imposed: Provided, That nothing in this section shall deprive any holder of such receipt or bill of lading of any remedy or right of action which he has under existing law.
 
 
 64
 That the common carrier, railroad, or transportation company issuing such receipt or bill of lading shall be entitled to recover from the common carrier, railroad, or transportation company on whose line the loss, damage, or injury shall have been sustained the amount of such loss, damage, or injury as it may be required to pay to the owners of such property, as may be evidenced by any receipt, judgment, or transcript thereof.
 
 
 65
 Act of June 29, 1906, Ch. 3591, Sec. 7, 34 Stat. 595 (emphasis added).
 
 
 66
 Then, on March 4, 1915, Congress enacted what is known as the First Cummins Amendment.[8] It replaced the language of the Carmack Amendment, quoted above; while adopting the Carmack Amendment's essential features, it expanded the statute's scope to carriage of goods in adjacent foreign countries, specifically provided that carriers were liable "for the full actual loss, damage, or injury" to property transported, and allowed carriers to require that shippers give them notice of the contents of articles the character of which was concealed by "wrapping, boxing, or other means," in which event the carrier could require the shipper to declare the value of the goods and thereby limit the carrier's liability accordingly. The critical language of the act in this latter respect stated:
 
 
 67
 Provided, however, That if the goods are hidden from view by wrapping, boxing, or other means, and the carrier is not notified as to the character of the goods, the carrier may require the shipper to specifically state in writing the value of the goods, and the carrier shall not be liable beyond the amount so specifically stated, in which case the Interstate Commerce Commission may establish and maintain rates for transportation, dependent upon the value of the property shipped as specifically stated in writing by the shipper. Such rates shall be published as are other rate schedules . . . .
 
 
 68
 It is to be noted that this special means of limiting liability was contained in a proviso to the general requirement for full liability. The special proviso quickly proved to be impractical and the very next year on August 9, 1916, in the Second Cummins Amendment, Congress struck the entire notice provision excerpted above, with its attendant limitation on liability, and substituted for that separate part of the First Cummins Amendment, the Second Cummins Amendment which by way of replacement of the stricken proviso provided:
 
 
 69
 "Provided, however, That the provisions hereof respecting liability for full actual loss, damage, or injury, notwithstanding any limitation of liability or recovery or representation or agreement or release as to value, and declaring any such limitation to be unlawful and void, shall not apply, first, to baggage carried on passenger trains or boats, or trains or boats carrying passengers; second, to property, except ordinary live stock, received for transportation concerning which the carrier shall have been or shall hereafter be expressly authorized or required by order of the Interstate Commerce Commission to establish and maintain rates dependent upon the value declared in writing by the shipper or agreed upon in writing as the released value of the property, in which case such declaration or agreement shall have no other effect than to limit liability and recovery to an amount not exceeding the value so declared or released, and shall not, so far as relates to values, be held to be a violation of section ten of this Act to regulate commerce, as amended; and any tariff schedule which may be filed with the commission pursuant to such order shall contain specific reference thereto and may establish rates varying with the value so declared or agreed upon; and the commission is hereby empowered to make such order in cases where rates dependent upon and varying with declared or agreed values would, in its opinion, be just and reasonable under the circumstances and conditions surrounding the transportation. The term 'ordinary live stock' shall include all cattle, swine, sheep, goats, horses, and mules, except such as are chiefly valuable for breeding, racing, show purposes, or other special uses."
 
 
 70
 Act of Aug. 9, 1916, Ch. 301, 39 Stat. 441-42. With insignificant wording refinements, the foregoing provision continues in the present law. Cf. 49 U.S.C. § 20(11), set forth in n.5, Supra.
 
 
 71
 It thus appears that the Second Cummins Amendment, by striking the "hidden . . . goods" proviso, left intact the requirement recognizing the carriers'
 
 
 72
 (liability) for any loss, damage, or injury . . . caused by . . . any common carrier . . . to which such property may be delivered . . . and No contract . . . or other limitation Of any character whatsoever shall exempt such common carrier . . . from the liability (hereby) imposed . . . for the full actual loss, damage, or injury to such property . . . Notwithstanding any limitation of liability or limitation of the amount of recovery or representation or agreement as to value in any . . . receipt or bill of lading, or in any contract, rule, regulation, or In any tariff filed with the Interstate Commerce Commission.
 
 
 73
 49 U.S.C. § 20(11) (emphasis added). This is subject only to the proviso added at that time which also recognizes the carriers' "liability for full actual loss . . . to property . . . concerning which the carrier shall have been . . . expressly authorized or required by order of the . . . Commission to establish and maintain rates dependent upon the value declared in writing by the shipper or agreed upon in writing as the released value of the property . . . ." Id.
 
 
 74
 The legislative history of the present act thus proves that carriers cannot without Commission authorization, except by a released value procedure, impose a prior "notice" procedure as a condition of their "acceptance" of household goods and thereby limit their liability. Such procedure was tried, found wanting, and specifically repealed by Congress in 1916.
 
 
 75
 V. ARTICLES MANUFACTURED FROM PRECIOUS METALS
 
 
 76
 Excluding carriers from liability for loss or damage of articles manufactured from precious metals is impermissible and particularly objectionable. This would include the silverware of every household which most certainly is included in practically every shipment of household goods when a family moves. Every carrier is on notice of this fact and must realize that practically every shipment will contain such articles. Thus, the attempt to exclude liability for such articles cannot be based on lack of notice that such articles were in the shipment but is obviously just a plain improper attempt by the carriers to limit their statutory and common law liability to the shipper.
 
 
 77
 WILKEY, Circuit Judge, concurring in part and dissenting in part.
 
 
 78
 I dissent from Part I of Judge Robb's opinion for the Court concerning the extraordinary value rule. Section 216(b) of the Interstate Commerce Act (the "Act") authorizes carriers to establish and enforce regulations governing the manner and method in which shippers are to present, mark, pack and deliver property for transportation.[1] Pursuant to this statutory authorization, the household goods carriers (the "Carriers"), petitioners here, adopted a regulation requiring shippers to notify carriers if certain designated items of extraordinary value, such as currency, bullion, and jewelry, are included in shipments by noting such items on the shipping documents.[2] The regulation states that a carrier will not assume liability for any such designated items not listed on the shipping document.
 
 
 79
 The purpose of this notification requirement is evident. The types of articles designated are generally small in size, easy to conceal, and high in value. The requirement that a shipper notify a carrier that such items are included in a shipment serves several important functions: first, it enables the carrier to provide the extra degree of protection necessary for safe handling of the article and commensurate with its high value; second, it protects the carrier and its employees against fraudulent assertions of loss by shippers; and third, it provides information necessary for the carrier to maintain proper insurance coverage of its operations.
 
 
 80
 In its 1 March 1976 order,[3] the Interstate Commerce Commission (the "Commission") struck down the Carriers' notification requirement on the ground that it was an exemption from, or limitation on, liability and, therefore, was in violation of Section 20(11) of the Act. That Section prohibits a carrier from exempting itself from liability, or limiting its liability, for loss or damage to property received by it for transportation, except with respect to property concerning which the carrier has been expressly authorized or required by the Commission to maintain rates dependent upon the value declared by the shipper in writing, or agreed upon in writing as the released value of the property.[4]
 
 
 81
 In my view the Carriers' notification requirement is Not an exemption from, or limitation on, liability prohibited by Section 20(11) of the Act. Rather, the notification requirement is a classic example of a condition of acceptance imposed by the carrier on shippers tendering property for transportation. Such conditions, designed not to limit liability but to control the risk of loss itself, have always been upheld if reasonable.[5] Therefore, I would hold that the Commission exceeded its authority in striking down the Carriers' notification requirement as violative of Section 20(11).
 
 
 82
 The majority acknowledges that there is a distinction between a condition of acceptance and a limitation on liability but states that "carriers can so abuse a particular condition that it operates, not as a condition of acceptance, but as a limitation on liability". This is, of course, true. In such a case the condition would be Unreasonable and, hence, a violation of Section 216(b). As I discuss more fully in part III of this dissent, the appropriate response by the Commission would be to strike down that Particular condition or delete those features of the condition it deemed unreasonable. But this is not what has happened here. In this case the Commission has found that two or three words in the current version of the carrier's extraordinary value rule are ambiguous and lend themselves to abuse so that they operate as limitations on liability. On this basis, the Commission has not just struck down this particular version of the rule, rather It has completely outlawed any and all extraordinary value rules; it has declared that all extraordinary value rules, no matter how reasonable and how tightly drawn, are Per se violative of Section 20(11). In short, it has exterminated a whole forest because it found a few dead branches on one tree. This is clearly wrong and beyond the
 
 
 83
 authority of the Commission. I. THE DISTINCTION BETWEEN
 
 
 84
 LIMITATIONS ON LIABILITY AND CONDITIONS OF ACCEPTANCE
 
 
 85
 The validity of the Carriers' notification requirement under Section 20(11) of the Act turns on the fundamental distinction between "limitations on liability" and "conditions of acceptance." Section 20(11) was intended to cover the former and not the latter.
 
 A. Limitations on Liability
 
 86
 At common law, the common carrier was a virtual insurer of the property it accepted for transportation, liable regardless of fault for the full amount of any loss or damage to such property unless it could show that the loss or damage was caused by (1) an act of God, (2) an act of the public enemy, (3) the inherent nature of the property shipped, (4) the act or omission of the shipper, or (5) the act or mandate of public authority.[6] The law was well settled, however, that a carrier could, unless forbidden by statute, place limitation and restrictions on this extensive common-law liability by means of a special contract.[7] Thus it was generally held that a carrier could bargain with a shipper for special terms in the carriage contract discharging the carrier from its broad common law responsibilities and supplanting them with contractual responsibilities of a more limited scope.
 
 
 87
 Thus, a limitation on liability was a stipulation which became part of the carriage contract and which qualified, by its own force, the carrier's liability for property accepted for transportation by either (1) excluding or excepting from coverage risks of loss or damage to the property caused by specified contingencies or perils, or (2) specifying a limit on the amount of indemnity which the carrier had undertaken to pay the shipper in the event of loss.[8] A common example of an exclusion of risk was a stipulation exempting a carrier from liability for loss due to fire or theft risks otherwise covered by a carriage contract in the absence of agreement to the contrary.[9] A common example of a limitation on indemnity was a stipulation providing that the carrier would be liable only for a predetermined amount, called an agreed valuation, in the event of loss or damage to a particular item of property, whether or not the agreed amount corresponded to the actual value of the property damaged.[10]
 
 
 88
 It must be emphasized that stipulations limiting the carrier's common-law liability could not be unilaterally imposed on the shipper by the carrier. Conceptually, the common carrier was under a pre-existing duty to accept the shipper's goods and transport them at a reasonable rate subject to its full common law responsibility, and therefore, the shipper was entitled to demand that the carrier transport the goods without any exemption from, or limitation on, liability.[11] This meant that any limitation on liability had to be bargained for by the carrier. This had three consequences. First, any exemption from, or limitation on, liability had to be assented to by the shipper.[12] Second, the exemption or limitation had to be supported by consideration in the form of reduced rates.[13] Third, the carrier had to give the shipper the option of shipping its goods under the carrier's restricted liability in consideration for a lower rate or of shipping its goods under the carrier's common-law liability at a higher, though presumably still reasonable, rate.[14]
 
 
 89
 Although, theoretically, a shipper had the right to insist that a carrier transport goods under its full common-law liability, a problem developed when carriers used their superior bargaining power to insert exemptions and limitations on liability in the carriage contracts. As the United States Supreme Court noted:[15]
 
 
 90
 The carrier and his customer do not stand upon a footing of equality. The individual customer has no real freedom of choice. He cannot afford to higgle or stand out, and seek redress in the courts. He prefers rather to accept any bill of lading, or to sign any paper, that the carrier presents; and in most cases he has no alternative but to do this, or to abandon his business.
 
 
 91
 One particular problem was that many carriers began to publish reduced rates based on agreed values and prohibitively high rates based on actual values of property shipped.[16] The net result of this practice was that shippers had no effective choice of rates and were denied full and fair recovery for shipments lost or damaged in transit.
 
 
 92
 Another problem relating to the carriers' practice of inserting in their carriage contracts restrictions on their common-law liability was the lack of uniformity in the law governing interstate shipments. Prior to federal legislation on the subject of carrier liability for goods carried in interstate shipments, the states were empowered to establish and apply their own laws and policies with respect to such liability and the right of the carrier to limit it by contract.[17] The efforts of carriers to limit their common-law liability by contract led to many different limitation provisions in bill of lading forms, and these varying terms were subject to construction by state courts and the application of varying policies by state legislatures and state courts. This lack of uniformity was a source of confusion and controversy in determining the liability of a common carrier on an interstate shipment.
 
 
 93
 It was in response to this dual problem of carrier overreaching and lack of uniformity that Congress enacted legislation controlling the right of carriers to seek exemptions from, or limitations on, their liability by special contract.[18] In 1906 Congress enacted the so-called Carmack Amendment.[19] This Amendment, as modified by the First Cummins Amendment of 1915[20] and the Second Cummins Amendment of 1916,[21] became Section 20(11) of the Interstate Commerce Act, and it restricts the right of carriers to limit their liability.[22] Its specific provisions will be addressed shortly.[23] The point to be made here is that this legislation was directed at problems raised by contractual limitations on the common-law liability of the common carrier. It was not concerned with the entirely separate and distinct carrier practice of imposing reasonable conditions on their acceptance of goods tendered by a shipper conditions designed not to limit liability, but rather to control the risk of loss itself.
 
 B. Conditions of Acceptance
 
 94
 The rigorous liability which the common law imposed on the carrier (and which the carrier sought to limit by contract) did not attach until the carrier had Accepted property for immediate shipment.[24] This is important because a carrier was not considered absolutely bound to accept all property tendered for shipment.[25] At common law the carrier had an undoubted right to condition its acceptance of goods on shipper compliance with just and reasonable rules and regulations designed to (1) promote efficient operations, (2) insure the safe transportation of property, and (3) protect the carrier from fraud and imposition. Thus, it was generally held that a carrier could make rules fixing the method and forms in which it would receive freight for transportation.[26] These rules were usually framed and enforced as conditions of acceptance. A condition of acceptance was a stipulation which called for the performance of some act by the shipper Before the carriage contract would come into existence. It was a condition precedent to the formation of a contract, and the carrier assumed No liability until there had been compliance with the condition by the shipper.
 
 
 95
 Examples of conditions of acceptance were stipulations by the carrier that it would not accept property for transportation unless the shipper tendering the property had packed it according to certain standards,[27] marked it according to certain guidelines,[28] or identified for the carrier any perishables or extraordinarily valuable items included in the tendered shipment.[29]
 
 
 96
 The common law was clear on the consequences of shipper non-compliance with a carrier's reasonable condition of acceptance. If a shipper tendered property which did not conform to the carriers' conditions, the carrier could properly reject the shipment.[30] Moreover, if a shipper induced a carrier to receive unwittingly a non-conforming shipment, then it was held that no enforceable contract existed between the carrier and shipper as to that shipment and that consequently the carrier could not be held liable for loss or damage thereto.[31] It was said that, in such a case, the carrier had never "accepted" the shipment and hence had never assumed liability for the property.[32]
 
 
 97
 There was, at common law, a special type of condition of acceptance which called for the shipper to make representations regarding the nature of property tendered for shipment.[33] A regulation, requiring a shipper to notify a carrier if extraordinarily valuable articles were included in a shipment, is an example of such a condition.[34] In the landmark case of Hart v. Pennsylvania Railroad Co.,[35] the Supreme Court noted the traditional right of carriers to condition their acceptance of goods on shipper compliance with such a rule:[36]
 
 
 98
 As a general rule, and in the absence of fraud or imposition, a common carrier is answerable for the loss of a package of goods though he is ignorant of its contents, and though its contents are ever so valuable, if he does not make a special acceptance. This is reasonable, because He can always guard himself by a special acceptance, or by insisting on being informed of the nature and value of the articles before receiving them. (Emphasis added.)
 
 
 99
 If a shipper did not accurately represent the nature of its shipment either by express misrepresentation or by silence, its conduct was deemed such a fraud on the carrier as to invalidate the contract or estop the shipper from making any claim thereon.[37] This principle and the policies underlying it have been stated as follows:[38]
 
 
 100
 The carrier has a clear right to know the contents of packages offered for shipment, in order that he may fix his compensation and know his risk. The statement of the shipper as to the character of an article not open to inspection is a representation as to a material factor of the contract, upon which the carrier may rely; and, if the value or character of the article actually shipped so varies from the contents of the package as represented as to materially affect the compensation of the carrier or the risk or expense of transportation, the carrier is not liable for the article of greater value received under a misapprehension caused by the shipper's untrue statement. This is merely the application of the familiar principle that a party to a contract is held only to that liability which falls fairly within the terms of the contract, and it makes no difference if an item which the other party wished to cover was omitted by his fraud or by his negligence.
 
 
 101
 It is said in Hutchinson on Carriers, § 213: "Fraud may be as effectually practiced upon the carrier by silence as by a positive and express misrepresentation. A neglect or failure to disclose the real value of a package and the nature of the contents, if there be anything in its form, dimensions, or other outward appearance which is calculated to throw the carrier off his guard, whether so designed or not, will be conduct amounting to a fraud upon him. The intention to impose upon him is not material. It is enough if such is the practical effect of the conduct of the shipper, as if a box or package, whether designedly or not, is so disguised as to cause it to resemble such a box or package as usually contains articles of little or no value, whereby the carrier is misled. For by such deception the carrier is thrown off his guard, and neglects to give to the package the care and attention which he would have given it had he known its actual value."
 
 
 102
 The rule at issue in this case reads as follows:
 
 
 103
 (i) No liability need be assumed for loss of or damage to any article of the following kinds UNLESS such article is specifically listed on the shipping document:
 
 
 104
 bills of exchange, bonds, bullion or precious metals, currency, deeds, documents, evidences of debt, credit cards, firearms, money, gems, jewelry, watches, precious stones, pearls, gold, silver or platinum articles, stock certificates, securities, stamp collections, stamps, letters or packets of letters, musical instruments of rare quality or historical significance, first editions or autographed copies of books, antique furniture, heirlooms, paintings, sculptures, works of art, and hobby collections.
 
 
 105
 This is a classic example of a condition of acceptance requiring shipper representation. Similar regulations have consistently been upheld by the courts as reasonable conditions.[39] In the old Pennsylvania case of Yaeck v. Adams Express Co.,[40] for example, the carrier's receipt contained the following clause:
 
 
 106
 3. Said property is accepted as merchandise only, and the company shall not be liable for the loss of money, bullion, bonds, coupons, jewelry, precious stones, valuable papers or other matter of extraordinary value unless such articles are enumerated in the receipt, as the company does not transport such articles except through its money department.
 
 
 107
 The suit was to recover for loss of jewelry contained in plaintiff's shipment. The court held for the defendant carrier, rejecting plaintiff's argument that the clause was an improper limitation on liability:[41]
 
 
 108
 The clause relating to jewelry in the receipt is a valid regulation of the defendant's business. It has not the effect to exempt the carrier from liability for negligence but is a proper notice that certain merchandise of unusual value is carried under special conditions only. Gold, jewelry and precious stones are peculiarly the subjects of cupidity and are as a matter of common prudence more carefully handled and securely guarded than ordinary merchandise. It is reasonable therefore that a carrier when called upon to transport such property should make a special acceptance and prescribe the conditions under which it is to be shipped. This right is not inconsistent with the rule that the carrier can not exempt himself from liability for the negligence of himself or his employees. He is entitled to receive compensation proportionate to the risk and to protect himself from fraud or imposition by reasonable rules and regulations: Hart v. Penna. Ry. Co., 112 U.S. 331 (5 S.Ct. 151, 28 L.Ed. 717); Adams Express Co. v. Croninzer, 226 U.S. 491 (33 S.Ct. 148, 57 L.Ed. 314). . . .
 
 
 109
 The evident purpose of the provision was to distinguish the enumerated articles from merchandise generally and to provide that for the shipment of a more valuable class a special method be used which required the statement in the receipt of the particular articles included in the shipment. This was in the interest of both the shipper and carrier as the plan adopted by the company insured greater care and a better means of ascertaining the time and place of losses if any should occur.
 
 
 110
 Thus, the distinctive feature of A true condition of acceptance at common law was that it Did not restrict or limit a carrier's liability. If the shipper complied with the condition, then the carrier accepted the property subject to its full common-law liability.[42] If the shipper did not comply with the condition, then the carrier assumed No liability to start with. The non-liability of the carrier for loss or damage to non-conforming property, therefore, did not result from the operation of the condition but rather from the wrongful conduct of the shipper. Furthermore, conditions of acceptance did not have to be bargained for by the carrier. The carrier had the Right to impose such conditions so long as they were reasonable. Therefore, in contrast to limitations on liability, conditions of acceptance did not have to be supported by consideration in the form of reduced rates. Nor was it necessary for the shipper to assent to the conditions; it was enough that the shipper received notice of their terms.[43]
 
 
 111
 Finally, the respective purposes of conditions of acceptance and limitations on liability are much different. Limitations on liability were designed to Restrict the scope of the risk assumed by a carrier. Conditions of acceptance were designed to Control the risk by reducing the chances of loss. The carrier assumed risks which included both physical and moral hazards the physical hazard of actual loss, the moral hazard of fraudulent claim. By imposing reasonable conditions of acceptance the carrier was better able to prevent against the physical hazard and protect against the moral hazard. Thus, reasonable conditions of acceptance did not change the nature of the undertaking of the common carrier, or limit its obligation in the care and management of that which was entrusted to it; rather, they improved the ability of the carrier to meet successfully the full-range of its responsibilities. They were, therefore, to the mutual advantage of the carrier and the shipper.
 
 
 112
 II. NON-APPLICABILITY OF SECTION 20(11) TO CONDITIONS OF ACCEPTANCE
 
 
 113
 In my view, the common-law distinction between conditions of acceptance and limitations on liability has been preserved under the Interstate Commerce Act. Section 216(b) of the Act preserves the right of carriers to impose reasonable conditions of acceptance, whereas Section 20(11) restricts the former right of carriers to bargain for limitations on their common-law liability.[44]
 
 
 114
 The Commission contends, however, that the proscriptions in Section 20(11) against certain limitations on liability extend to conditions of acceptance such as the carriers' extraordinary value rule. This position, accepted by the majority, cannot be sustained in light of the language of Section 20(11), the case law construing the provision, and the Commission's own interpretation of it with respect to carriers' rules on perishables.
 
 
 115
 By its terms, Section 20(11) applies only to carriers "Receiving property for transportation." This suggests that the provision is intended to cover cases where the carrier has actually Accepted goods for carriage and is seeking limited liability under its carriage contract.[45] Conversely, the provision does not cover cases where the carrier has Not accepted goods for transportation. A carrier that conditions its acceptance of designated articles on shipper compliance with a rule such as the one here in issue cannot be deemed to have "accepted" such articles where notification has been withheld and the articles have been secreted in the shipment without the carrier's knowledge. Thus, Section 20(11) does not prevent carriers from adopting, under authority of Section 216(b), reasonable conditions precedent to their acceptance of property; the extraordinary value rule is, therefore, not in conflict with the statute.
 
 
 116
 This interpretation has been adopted by the few courts that have considered the applicability of Section 20(11) to carrier conditions of acceptance, such as the extraordinary value rule. These courts have held that the extraordinary value rule Does not violate Section 20(11).[46] In Garrett v. Greyhound Van Lines, Inc.,[47] for example, a carton containing watch jobs and two pistols with a total value of $10,300.00 was missing from an interstate shipment of household goods at the time of delivery. The court found that the shipper had a full opportunity to disclose these articles of extraordinary value to the carrier but did not do so. In considering the validity of the carrier's rule relieving it from liability for articles of extraordinary value coming into its possession without its knowledge, the court stated:[48]
 
 
 117
 I find that the defendant is not liable for this loss since it did not at any time undertake to transport these valuable items. . . .
 
 
 118
 . . . Under the provisions of 49 U.S.C. Sec. 20(11) a common carrier is liable for the full actual loss caused by it to the goods it transports unless it has previously entered into an agreement with the shipper for a released or declared value on those goods. This statute had no application in a situation such as here where the shipper deliberately withholds from the carrier information regarding the existence of goods of extraordinary value and attempts to transport them at the lowest rate available along with goods of ordinary value. Hecker Products Corp. v. Transamerica Freight Lines, Inc. (296 Mich. 381), 296 N.W. 297 (Mich.1941); Allied Van Lines, Inc. v. Smith (28 Colo.App. 85), 470 P.2d 926, (Colo.App.1970). A contrary result may have been reached if some disclosure had been made of the identity of these goods. Thomas Electronics, Inc. v. H. W. Tayton Co., 297 F.Supp. 639 (M.D.Pa.1967).
 
 
 119
 In addition to the court cases which hold that the extraordinary value rule does not violate Section 20(11), the Commission itself recognizes that a rule of this kind is not a violation of the statute.[49] In its 1 March Order here under review the Commission adopted a regulation which expressly authorizes the carriers to establish a tariff rule relieving themselves of liability in the absence of knowledge that a particular type of article is contained in a shipment. The regulation reads as follows:[50]
 
 
 120
 Section 1056.16 Liability of carriers.
 
 
 121
 (i) No Liability need be assumed for perishable articles included in the shipment without the knowledge of the carrier; and a carrier accepting for shipment perishable articles May impose reasonable conditions necessary to insure the safe transportation of such commodities.
 
 
 122
 One need only substitute the words "article of extraordinary value" for the words "perishable items", and the extraordinary value rule appears in abbreviated form.
 
 
 123
 This is not an authorization by the Commission to the carrier for publication of a limited liability rule for perishables based on the value declared for such articles, in accordance with the exception in Section 20(11). Rather, it is an authorization to publish a rule completely exonerating the carrier from liability for loss or damage to such articles, where the carrier has no knowledge that the perishable articles are contained in the shipment. The Commission could not have adopted this regulation if the prohibition in Section 20(11) were construed as extending to a rule of this type. Likewise, the Carriers' extraordinary value rule, which in principle is the same as the rule authorized by the Commission for perishables, is not within the prohibition of Section 20(11).
 
 
 124
 In sum, then, the language of Section 20(11), the reasons for its enactment, the case law, and the Commission's own interpretation of the provision as exemplified in the rule on perishables, all indicate that Section 20(11) poses no bar to the Carriers' extraordinary value rule. Justification for the Commission's action in striking down this longstanding rule must be found elsewhere than in the proscriptions of Section 20(11).
 
 
 125
 III. THE REASONABLENESS OF EXTRAORDINARY VALUE RULE
 
 
 126
 The proper standard for evaluating the validity of a carrier-imposed condition of acceptance, such as the extraordinary value rule here at issue, is the "Reasonableness " of the condition. This was the test of validity at common law,[51] and this standard has been preserved in Section 216(b) of the Act.[52]
 
 
 127
 It may well be that This particular extraordinary value rule unreasonably impinges on the rights of the shipping public by its use of ambiguous and elastic generic terms which lend themselves to abuse. It May be unreasonable to expect shippers to identify "heirlooms", or "antique furniture", or even "works of art". Perhaps these somewhat vague terms do give carriers the opportunity to make bad faith assertions after a loss or damage claim has been filed. If the specific list of items now contained in the Carriers' extraordinary value rule includes any particular item which the Commission deems unreasonable, the Commission certainly could require that particular item be corrected or deleted. But the Commission has not followed this reasonable approach. Acting on the mistaken belief that the rule was In principle violative of Section 20(11), the Commission has struck down the rule In toto, and implicitly proscribed All such rules no matter how tightly drawn. This action was clearly beyond the Commission's authority.
 
 
 128
 I respectfully dissent.
 
 
 
 [1]
 Petitioners Household Goods Carriers Bureau and Movers' and Warehousemen's Association do not object to this aspect of the rule
 
 
 [2]
 Carriers are liable for this kind of damage only in cases of shipments of personal effects and property used in a dwelling shipments usually made by individuals or families. Other types of household goods, office furniture, exhibits, and objects of art, are usually shipped by businessmen experienced in interstate shipping, who are in a position to foresee dangers and to absorb and spread losses as well as the carriers; accordingly, the Commission did not require the carriers to be liable for loss or damage due to strikes, riots or civil disturbances in the cases of these latter shipments. J.A. 201; See 49 C.F.R. § 1056.1(a)
 
 
 [1]
 In concurring in the court's opinion, I agree that the Commission's Report and Order served March 1, 1976 (J.A. 166-198), 124 M.C.C. 395 as supplemented by its Order served May 26, 1976 (J.A. 200-202) is lawful in that it (1) prohibits carriers from requiring shippers to give notice of certain items being shipped; (2) prohibits carriers from limiting their liability for loss or damage of household goods of extraordinary value, or (3) to owner packed items; (4) prescribes a formula to apply in determining the "full actual loss" sustained by shippers of household goods; and (5) prohibits carriers from disclaiming liability for losses due to riots and strikes while the goods are in transit
 
 
 [2]
 The ICC's final report in this proceeding referred to the language set out in the text as the "present uniform household goods bill of lading." 124 M.C.C. at 408. This bill of lading was set forth by the Commission in its Interim Report in the same proceeding, issued March 28, 1975 (121 M.C.C. 347; J.A. 111). The bill of lading referred to as the "uniform household goods bill of lading" was set forth as Appendix A to the Interim Report. That Appendix described the bill of lading as "A typical household goods tariff (Household Goods Carriers' Bureau Tariff No. 155-A, MF-I.C.C. No. 172)" (emphasis original)
 
 
 [3]
 For 49 C.F.R. 1056.16(c)(i), See text at --- of 189 U.S.App.D.C., at 448 of 584 F.2d
 
 
 [4]
 The Household Goods Carriers' Bureau described the language of this proposal as "a modification of the rule which the carriers have heretofore published in their tariffs." Br. at 10
 
 
 [5]
 In full, § 20(11) provides:
 § 20, par. (11). Liability of initial and delivering carrier for loss; limitation of liability; notice and filing of claim. Any common carrier, railroad, or transportation company subject to the provisions of this chapter receiving property for transportation from a point in one State or Territory or the District of Columbia to a point in another State, Territory, District of Columbia, or from any point in the United States to a point in an adjacent foreign country shall issue a receipt or bill of lading therefor, and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it or by any common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass within the United States or within an adjacent foreign country when transported on a through bill of lading, and no contract, receipt, rule, regulation, or other limitation of any character whatsoever shall exempt such common carrier, railroad, or transportation company from the liability imposed; and any such common carrier, railroad, or transportation company so receiving property for transportation from a point in one State, Territory, or the District of Columbia to a point in another State or Territory, or from a point in a State or Territory to a point in the District of Columbia, or from any point in the United States to a point in an adjacent foreign country, or for transportation wholly within a Territory, or any common carrier, railroad, or transportation company delivering said property so received and transported shall be liable to the lawful holder of said receipt or bill of lading or to any party entitled to recover thereon, whether such receipt or bill of lading has been issued or not, for the full actual loss, damage, or injury to such property caused by it or by any such common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass within the United States or within an adjacent foreign country when transported on a through bill of lading, notwithstanding any limitation of liability or limitation of the amount of recovery or representation or agreement as to value in any such receipt or bill of lading, or in any contract, rule, regulation, or in any tariff filed with the Interstate Commerce Commission; and any such limitation, without respect to the manner or form in which it is sought to be made is declared to be unlawful and void: Provided, That if the loss, damage, or injury occurs while the property is in the custody of a carrier by water the liability of such carrier shall be determined by the bill of lading of the carrier by water and by and under the laws and regulations applicable to transportation by water, and the liability of the initial or delivering carrier shall be the same as that of such carrier by water: Provided, however, That the provisions hereof respecting liability for full actual loss, damage, or injury, notwithstanding any limitation of liability or recovery or representation or agreement or release as to value, and declaring any such limitation to be unlawful and void, shall not apply, first, to baggage carried on passenger trains or boats, or trains or boats carrying passengers; second, to property, except ordinary livestock, received for transportation concerning which the carrier shall have been or shall be expressly authorized or required by order of the Interstate Commerce Commission to establish and maintain rates dependent upon the value declared in writing by the shipper or agreed upon in writing as the released value of the property, in which case such declaration or agreement shall have no other effect than to limit liability and recovery to an amount not exceeding value so declared or released, and shall not, so far as relates to values, be held to be a violation of section 10 of this title; and any tariff schedule which may be filed with the commission pursuant to such order shall contain specific reference thereto and may establish rates varying with the value so declared and agreed upon; and the commission is empowered to make such order in cases where rates dependent upon and varying with declared or agreed values would, in its opinion, be just and reasonable under the circumstances and conditions surrounding the transportation. The term "ordinary livestock" shall include all cattle, swine, sheep, goats, horses, and mules, except such as are chiefly valuable for breeding, racing, show purposes, or other special uses: Provided further, That nothing in this section shall deprive any holder of such receipt or bill of lading of any remedy or right of action which he has under the existing law: Provided further, That all actions brought under and by virtue of this paragraph against the delivering carrier shall be brought, and may be maintained, if in a district court of the United States, only in a district, and if in a State court, only in a State through or into which the defendant carrier operates a line of railroad: Provided further, That it shall be unlawful for any such receiving or delivering common carrier to provide by rule, contract, regulation, or otherwise a shorter period for the filing of claims that nine months, and for the institution of suits than two years, such period for institution of suits to be computed from the day when notice in writing is given by the carrier to the claimant that the carrier has disallowed the claim or any part or parts thereof specified in the notice: And provided further, That for the purposes of this paragraph and of paragraph (12) of this section the delivering carrier shall be construed to be the carrier performing the line-haul service nearest to the point of destination and not a carrier performing merely a switching service at the point of destination: And provided further, That the liability imposed by this paragraph shall also apply in the case of property reconsigned or diverted in accordance with the applicable tariffs filed as in this chapter provided.
 
 
 [6]
 See Missouri Pacific Rr. Co. v. Elmore & Stahl, 377 U.S. 134, 140, 84 S.Ct. 1142, 12 L.Ed.2d 194 (1964); Southwestern Sugar & Molasses Co. v. River Terminals Corp., 360 U.S. 411, 417 n.6, 79 S.Ct. 1210, 3 L.Ed.2d 1334 (1959); Secretary of Agriculture v. United States, 350 U.S. 162, 165-66 n.9, 76 S.Ct. 244, 100 L.Ed. 173 (1956); Chesapeake & Ohio Ry. Co. v. Thompson Manufacturing Co., 270 U.S. 416, 421-22, 46 S.Ct. 318, 70 L.Ed. 659 (1926)
 
 
 [7]
 This language appears in the released value proviso of § 20(11), which is the second proviso in the section, and begins "Provided, however." See note 5 Supra
 
 
 [8]
 "That any common carrier, railroad, or transportation company subject to the provisions of this Act receiving property for transportation from a point in one State or Territory or the District of Columbia to a point in another State, Territory, District of Columbia, or from any point in the United States to a point in an adjacent foreign country shall issue a receipt or bill of lading therefor, and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it or by any common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass within the United States or within an adjacent foreign country when transported on a through bill of lading, and no contract, receipt, rule, regulation, or other limitation of any character whatsoever, shall exempt such common carrier, railroad, or transportation company from the liability hereby imposed; and any such common carrier, railroad, or transportation company so receiving property for transportation from a point in one State, Territory, or the District of Columbia to a point in another State or Territory, or from a point in a State or Territory to a point in the District of Columbia, or from any point in the United States to a point in an adjacent foreign country, or for transportation wholly within a Territory shall be liable to the lawful holder of said receipt or bill of lading or to any party entitled to recover thereon, whether such receipt or bill of lading has been issued or not, for the full actual loss, damage, or injury to such property caused by it or by any such common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass within the United States or within an adjacent foreign country when transported on a through bill of lading, notwithstanding any limitation of liability or limitation of the amount of recovery or representation or agreement as to value in any such receipt or bill of lading, or in any contract, rule, regulation, or in any tariff filed with the Interstate Commerce Commission; and any such limitation, without respect to the manner or form in which it is sought to be made is hereby declared to be unlawful and void: Provided, however, That if the goods are hidden from view by wrapping, boxing, or other means, and the carrier is not notified as to the character of the goods, the carrier may require the shipper to specifically state in writing the value of the goods, and the carrier shall not be liable beyond the amount so specifically stated, in which case the Interstate Commerce Commission may establish and maintain rates for transportation, dependent upon the value of the property shipped as specifically stated in writing by the shipper. Such rates shall be published as are other rate schedules: Provided further, That nothing in this section shall deprive any holder of such receipt or bill of lading of any remedy or right of action which he has under the existing law: Provided further, That it shall be unlawful for any such common carrier to provide by rule, contract, regulation, or otherwise a shorter period for giving notice of claims than ninety days and for the filing of claims for a shorter period than four months, and for the institution of suits than two years: Provided, however, That if the loss, damage, or injury complained of was due to delay or damage while being loaded or unloaded, or damaged in transit by carelessness or negligence, then no notice of claim nor filing of claim shall be required as a condition precedent to recovery."
 Act of March 4, 1915, Ch. 176, Sec. 1, 38 Stat. 1196-97.
 
 
 [1]
 49 U.S.C. § 316(b). This subsection provides:
 It shall be the duty of every common carrier of property by motor vehicle to provide safe and adequate service, equipment, and facilities for the transportation of property in interstate or foreign commerce; to establish, observe, and enforce just and reasonable rates, charges, and classifications, and just and reasonable regulations and practices relating thereto and to the manner and method of presenting, marketing, packing, and delivering property for transportation, the facilities for transportation, and all other matters relating to or connected with the transportation of property in interstate or foreign commerce.
 
 
 [2]
 The rule reads as follows:
 (i) No liability need be assumed for loss of or damage to any article of the following kinds UNLESS such article is specifically listed on the shipping document:
 bills of exchange, bonds, bullion or precious metals, currency, deeds, documents, evidences of debt, credit cards, firearms, money, gems, jewelry, watches, precious stones, pearls, gold, silver or platinum articles, stock certificates, securities, stamp collections, stamps, letters or packets of letters, musical instruments of rare quality or historical significance, first editions or autographed copies of books, antique furniture, heirlooms, paintings, sculptures, works of art, and hobby collections.
 J.A. at 179
 
 
 [3]
 Practices of Motor Carriers of Household Goods (Limitations on Liability), Ex Parte No. MC-19 (Sub-No. 20). 1 March 1976, reproduced in J.A. at 166-198
 
 
 [4]
 49 U.S.C. § 20(11):
 (11) Any common carrier, railroad, or transportation company subject to the provisions of this chapter receiving property for transportation from a point in one State or Territory or the District of Columbia to a point in another State, Territory, District of Columbia, or from any point in the United States to a point in an adjacent foreign country shall issue a receipt or bill of lading therefor, and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it or by any common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass within the United States or within an adjacent foreign country when transported on a through bill of lading, and no contract, receipt, rule, regulation, or other limitation of any character whatsoever shall exempt such common carrier, railroad, or transportation company from the liability imposed; and any such common carrier, railroad, or transportation company so receiving property for transportation from a point in one State, Territory, or the District of Columbia to a point in another State or Territory, or from a point in a State or Territory to a point in the District of Columbia, or from any point in the United States to a point in an adjacent foreign country, or for transportation wholly within a Territory, or any common carrier, railroad, or transportation company delivering said property so received and transported shall be liable to the lawful holder of said receipt or bill of lading or to any party entitled to recover thereon, whether such receipt or bill of lading has been issued or not, for the full actual loss, damage, or injury to such property caused by it or by any such common carrier, railroad, or transportation company to which such property may pass within the United States or within an adjacent foreign country when transported on a through bill of lading, notwithstanding any limitation of liability or limitation of the amount of recovery or representation or agreement as to value in any such receipt or bill of lading, or in any contract, rule, regulation, or in any tariff filed with the Interstate Commerce Commission; and any such limitation, without respect to the manner or form in which it is sought to be made is declared to be unlawful and void: . . . Provided, however, That the provisions hereof respecting liability for full actual loss, damage, or injury, notwithstanding any limitation of liability or recovery or representation or agreement or release as to value, and declaring any such limitation to be unlawful and void, shall not apply, first, to baggage carried on passenger trains or boats, or trains or boats carrying passengers; second, to property, except ordinary livestock, received for transportation concerning which the carrier shall have been or shall be expressly authorized or required by order of the Interstate Commerce Commission to establish and maintain rates dependent upon the value declared in writing by the shipper or agreed upon in writing as the released value of the property, in which case such declaration or agreement shall have no other effect than to limit liability and recovery to an amount not exceeding the value so declared or released . . . .
 
 
 [5]
 See discussion in part I.B. of this opinion
 
 
 [6]
 E. g., Shapiro v. Pennsylvania R. Co., 65 App.D.C. 324, 83 F.2d 581 (1936)
 
 
 [7]
 E. g., American R. Exp. v. Levee, 263 U.S. 19, 44 S.Ct. 11, 68 L.Ed. 140 (1923); Boston & M. R. Co. v. Piper, 246 U.S. 439, 38 S.Ct. 354, 62 L.Ed. 820 (1918); Adams Exp. Co. v. Allendale Farm, 116 Va. 1, 81 S.E. 42 (1914); Willock v. Pennsylvania R. Co., 166 Pa. 184, 30 A. 948 (1895)
 There was, however, a definite limit on the extent to which a carrier could restrict its common-law liability by special contract. It was uniformly held that the carrier could not relieve itself from liability for loss or damage caused by its own willful or negligent acts. E. g., Adams Exp. Co. v. Croninger, 226 U.S. 491, 33 S.Ct. 148, 57 L.Ed. 314 (1913). Any term in a carriage contract purporting to relieve a carrier from such liability was deemed void as against public policy. There was some conflict at common law, however, concerning the validity of special contracts limiting the amount recoverable by a shipper by providing that the carrier's liability was not to exceed an agreed valuation. Some courts held that such valuation agreements fell under the condemnation of the general principle prohibiting contracts which relieved the carrier from liability for negligence. E. g., Chicago, R. I. & P. R. Co. v. Witty, 32 Neb. 275, 49 N.W. 183 (1891). The majority of courts, however, held that, in the absence of a statutory prohibition, a carrier could restrict by contractual agreement the amount recoverable by the shipper in case of loss or damage to property transported, even where the loss or damage was caused by the negligence of the carrier. E. g., Graves v. Lake Shore & M. S. R. Co., 137 Mass. 33, 50 Am.Rep. 282 (1884). The federal courts adopted this latter position. Hart v. Pennsylvania Railroad Co., 112 U.S. 331, 5 S.Ct. 151, 28 L.Ed. 717 (1884).
 
 
 [8]
 Compare Chicago & N. W. R. Co. v. Chapman, 133 Ill. 96, 24 N.E. 417 (1890), and Tarbell v. Royal Exchange Shipping Co., 110 N.Y. 170, 17 N.E. 721 (1888), With D'Utassy v. Barrett, 219 N.Y. 420, 114 N.E. 786 (1916), and Donlon Bros. v. Southern P. Co., 151 Cal. 763, 91 P. 603 (1907)
 
 
 [9]
 E. g., Arthur v. Texas & P. R. Co., 204 U.S. 505, 27 S.Ct. 338, 51 L.Ed. 590 (1907)
 
 
 [10]
 E. g., Union P. R. Co. v. Burke, 255 U.S. 317, 41 S.Ct. 283, 65 L.Ed. 656 (1921)
 
 
 [11]
 See generally R. Brown, The Law of Personal Property § 12.14 (3rd ed. 1975)
 
 
 [12]
 E. g., Michigan C. R. Co. v. Mineral Springs Mfg. Co., 16 Wall. 318, 83 U.S. 318, 21 L.Ed. 297 (1872)
 
 
 [13]
 E. g., Lake Erie & W. R. Co. v. Holland, 162 Ind. 406, 69 N.E. 138 (1903)
 
 
 [14]
 E. g., F. A. Straus & Co. v. Canadian & P. R. Co., 254 N.Y. 407, 173 N.E. 564 (1930)
 
 
 [15]
 Liverpool & Great Western Stream Co. v. Phenix Insurance Co., 129 U.S. 397, 441, 9 S.Ct. 469, 471, 32 L.Ed. 788 (1889)
 
 
 [16]
 See Rules, Regulations, and Practices of Regulated Carriers With Respect to the Processing of Loss and Damage Claims, 340 I.C.C. 515, 521 (1972)
 
 
 [17]
 See generally R. Sigmon, Miller's Law of Freight Loss and Damage Claims 7-18 (4th ed. 1974)
 
 
 [18]
 Id
 
 
 [19]
 34 Stat. 595
 
 
 [20]
 38 Stat. 1197
 
 
 [21]
 39 Stat. 441
 
 
 [22]
 See text of Section 20(11) at note 4, Supra
 
 
 [23]
 See discussion at pages --- - --- of 189 U.S.App.D.C., at page 459 of 584 F.2d, Infra
 
 
 [24]
 E. g., Dugdale Packing Co. v. Atchison, Topeka & Santa Fe R. Co., 347 F.Supp. 1276 (1972)
 
 
 [25]
 E. g., Southern Exp. Co. v. R. M. Rose Co., 124 Ga. 581, 53 S.E. 185 (1906); Kirby v. Western U. Tel. Co., 4 S.D. 105, 55 N.W. 759 (1893)
 
 
 [26]
 See, e. g., Central of Georgia Ry. Co. v. Smith, 31 Ga.App. 135, 120 S.E. 30 (1923); Coupland v. Housatonic R. Co., 61 Conn. 531, 23 A. 870 (1892); Oppenheimer v. U. S. Exp. Co., 69 Ill. 62 (1873)
 
 
 [27]
 E. g., Thompson-Houston Electric Co. v. Simon, 20 Or. 60, 25 P. 147 (1890)
 
 
 [28]
 E. g., Bell Tel. Co. v. American Exp. Co., 92 Pa.Super. 180 (1927)
 
 
 [29]
 E. g., Yaeck v. Adams Exp. Co., 69 Pa.Super. 143 (1918)
 
 
 [30]
 E. g., Southern Exp. Co. v. R. M. Rose Co., 124 Ga. 581, 53 S.E. 185 (1906)
 
 
 [31]
 E. g., Kirwan v. Railway Express Agency, Inc., 718 Pa.Super. 431, 179 A. 924 (1935); Bell Tel. Co. v. American Exp. Co., 92 Pa.Super. 180 (1927), Yaeck v. Adams Exp. Co., 69 Pa.Super. 143 (1918)
 
 
 [32]
 E. g., Charleston & Savannah Ry. Co. v. Moore, 80 Ga. 522, 5 S.E. 769 (1885)
 
 
 [33]
 Such a shipper representation is analogous to a representation made by a prospective insured to an insurer. It may be defined as a statement by the shipper, preceding the contract, and in the nature of an inducement to contract, relating to the existence of facts or conditions concerning the nature of the property tendered for shipment, knowledge of which is necessary for the carrier to form a just estimate of the risk it is assuming so that it may take protective measures commensurate with the risk. Compare 7 Couch on Insurance 2d § 35.3-s 35.6; 12 Appleman, Insurance Law and Practice, § 7291-s 7293
 
 
 [34]
 See, e. g., Kirwan v. Railway Express Agency, Inc., 118 Pa.Super. 431, 179 A. 924 (1935); Yaeck v. Adams Exp. Co., 69 Pa.Super. 143 (1918). Coupland v. Housatonic R. Co., 61 Conn. 531, 549, 23 A. 870, 875 (1892) ("Actual notice, given by a common carrier to his customer, specifying the terms on which he receives and carries goods, becomes parcel of the contract when it is proved that the property was delivered on the terms thus offered. And, though it be not made the basis of a contract, it often becomes effective to shield the carrier from liability for things of special and peculiar value, not disclosed at the time of delivery; for it appears to be agreed that the carrier may in this manner require the shipper to state the nature or value of the property at the risk of having it received and carried as an article of ordinary value. The carrier does not impose an illegal condition. He asks for reasonable information bearing on the transaction; and the shipper is left free to act on his own discretion, accepting the legitimate consequences of his conduct.")
 
 
 [35]
 112 U.S. 331, 5 S.Ct. 151, 28 L.Ed. 717 (1884)
 
 
 [36]
 Id. at 340, 5 S.Ct. at 155
 
 
 [37]
 See, e. g., Southern Exp. Co. v. Hanaw, 134 Ga. 445, 67 S.E. 944 (1910); Chesapeake & O. R. Co. v. Hall, 136 Ky. 379, 124 S.W. 372 (1910); Magnin v. Dinsmore, 62 N.Y. 35 (1875); Bottum v. Charleston & W. C. R. Co., 72 S.C. 375, 51 S.E. 985 (1905); Chesapeake & O. R. Co. v. Osborne, 154 Va. 477, 153 S.E. 865 (1930)
 
 
 [38]
 Bottum v. Charleston & W. C. R. Co., 72 S.C. 375, 51 S.E. 985, 986 (1905)
 
 
 [39]
 See cases cited at notes 34-38, Supra
 
 
 [40]
 69 Pa.Super. 143 (1918)
 
 
 [41]
 Id. at 146
 
 
 [42]
 Such true conditions of acceptance are to be distinguished from provisions which actually limit liability although they are framed as conditions. See, e. g., Atchison, Topeka & Santa Fe R. Co. v. United States, No. T-4926 (D.Kan., 9 August 1972)
 
 
 [43]
 E. g., Coupland v. Housatonic R. Co., 61 Conn. 531, 23 A. 870 (1892); Oppenheimer v. United States Exp. Co., 69 Ill. 62 (1873); McMillan v. Michigan S. & N. I. R. Co., 16 Mich. 79, 93 Am.Dec. 208 (Mich.1867)
 
 
 [44]
 The text of 49 U.S.C. § 20(11) is set forth at note 4, Supra
 
 
 [45]
 This appears to have been the interpretation placed on the word "receiving" by the Commission itself. In an extensive investigation entitled Ex Parte No. 263, Rules, Regulations, and Practices of Regulated Carriers With Respect to the Processing of Laws and Damage Claims, 340 I.C.C. 515, 522 (1972), the Commission examined Section 20(11) and congressional intent with respect thereto in detail, concluding:
 The substance of section 20(11) of the act, then, as it now applies to carriers other than those by water (which will be considered next), represents a restatement of the common law rule that a common carrier is ordinarily a virtual insurer against loss, damage, or injury to Property it accepts for transportation, and that only this Commission has the authority to modify this general rule by granting partial exemptions from full liability in cases where the applicable rates depend upon and vary with the declared or agreed values of the goods to be transported (released rates). (Emphasis added).
 
 
 [46]
 Garrett v. Greyhound Van Lines, Inc., No. 70-821 (D.Or., 8 February 1972); Hecker Products Corp. v. Trans-American Freight Lines, Inc., 296 Mich. 381, 296 N.W. 297 (1941). Cf. Allied Van Lines, Inc. v. Smith, 28 Colo.App. 85, 470 P.2d 926 (1970)
 
 
 [47]
 See note 46, Supra ; opinion reproduced in Petitioner's Brief, Appendix at 1a-4a
 
 
 [48]
 Id. at 3a
 
 
 [49]
 Indeed, the extraordinary value rule and Section 20(11) have coexisted under the Commission's watchful eye for over 40 years. Section 20(11) in its present form has been in the Interstate Commerce Act since the Second Cummins Amendment in 1916 (39 Stat. 441). The household goods carriers, along with other motor carriers, were brought under the jurisdiction of the Commission by the Motor Carrier Act of 1935 (Interstate Commerce Act Part II). On 23 March 1936 the initial household goods carrier tariff was filed by the Household Goods Carriers' Bureau on behalf of its member carriers. That original tariff contained the extraordinary value rule; and every tariff since that date has contained that rule. Thus, the extraordinary value rule has been a part of the household goods carriers' tariff and operations for over forty years. Yet, during that entire period of forty years, neither the Commission nor any court has ever held the extraordinary value rule of the household goods carriers to be in violation of section 20(11)
 
 
 [50]
 J.A. at 193 (Emphasis added)
 
 
 [51]
 E. g., Platt v. Lecocq, 158 F. 723 (8th Cir. 1907)
 
 
 [52]
 49 U.S.C. § 316(b) expressly authorizes "just and reasonable regulations."