NATIONAL BUS TRAFFIC ASSOCIA-
TION, INC., Petitioner,

v.

INTERSTATE COMMERCE COMMIS-
SION and the United States of
America, Respondents.

No. 78–1163.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 29, 1979.

Decided Sept. 12, 1979.

Charles A. Webb, Washington, D. C., for petitioner. Drew L. Carraway, John S. Fessenden, and J. Curtis Bradley, III, Washington, D. C., were on brief, for petitioner.

Kenneth P. Kolson, Atty., I. C. C., Washington, D. C., with whom Robert S. Burk, Acting Gen. Counsel, Frederick W. Read, III, Associate Gen. Counsel, I. C. C., Robert B. Nicholson and Andrea Limmer, Attys., Dept. of Justice, Washington, D. C., were on brief, for respondents.

Before McGOWAN, TAMM and WILKEY, Circuit Judges.

Opinion for the court filed by TAMM, Circuit Judge.

Dissenting opinion filed by WILKEY, Circuit Judge.

TAMM, Circuit Judge:

This case involves tariff rules proposed by the National Bus Traffic Association, Inc. (NBTA)[1] that would prohibit acceptance in bus express service of (1) shipments exceeding $500 in actual value and (2) jewelry, watches, and magazines, regardless of value. The Interstate Commerce Commission (Commission) found the proposed rules un-

just and unreasonable.[2] We affirm the Commission's order.

## I

Rules 5 and 15 of the existing National Express Tariff specify the characteristics of shipments that motor carriers of passengers will transport via bus express service.[3] Rule 5(a) provides, "[n]o single Shipment will be accepted for transportation which exceeds . . . $250 . . . in Declared or Released Value."[4] Joint Appendix (J.A.) at 224. Rule 15 states that carriers will not transport shipments of jewelry, watches, or magazines with declared or released values over $50. The declared value of an article is the value stated by the shipper. The released value of an article is the value agreed upon by the shipper and the carrier. See 49 U.S.C.A. § 10730 (West pamphlet 1979). Neither declared nor released value is necessarily equivalent to actual value, which generally refers to the market price or replacement cost of the item. See Household Goods Carriers' Bureau v. ICC, 189 U.S.App.D.C. 279, 283, 584 F.2d 437, 441 (D.C. Cir. 1978); Brief for Petitioner at 5 (recognizing "practical difference" between actual value and declared or released value).

■ In December 1976, the Commission instituted an inquiry into the lawfulness of Rules 5 and 15 under 49 U.S.C.A. § 10730.[5]

---

1. The National Bus Traffic Association, Inc. (NBTA) is an association of passenger motor carriers. As of April 1, 1978, it had 351 members. See Appendix to Brief for Petitioner.

2. Prohibitions & Limitations on Shipments of Articles (Order), 355 I.C.C. 793, 797 (1977).

3. Express service refers to the expedited transportation of comparatively small shipments of goods. It is usually conducted through passenger trains and passenger buses, rather than by rail-freight or motor-freight. Railway Express Agency, Inc., Extension of Operations—Durant-Kosciusko, 34 M.C.C. 111, 114 (1942); see Coordination of Motor Transp., 182 I.C.C. 263, 348 (1932).

4. Both existing Rule 5 and modified Rule 5, see 198 U.S.App.D.C. at ——, 613 F.2d at 883–884 contain exceptions not relevant in this proceeding.

5. Pursuant to this section, carriers may limit their liability to the declared or released value

of the shipment only if they charge lower rates specifically approved by the Commission. See Household Goods Carriers' Bureau v. ICC, 189 U.S.App.D.C. 279, 281, 584 F.2d 437, 439 (D.C. Cir. 1978). In 1949, the Commission issued Released Rates Order No. MC–293, which authorized NBTA to establish and maintain released rates for bus express service. 14 Fed. Reg. 369, 1127 (1949). The Commission was concerned that Rules 5 and 15, as released rate tariffs, did not comport with the authorization requirements of MC–293 and thus unlawfully limited liability. The Commission ordered NBTA to show cause why the rules should not be stricken. On May 10, 1977, the Commission issued an order holding the show cause order in abeyance pending the outcome of the present case. Accordingly, those rules are currently in effect. Existing Rules 5 and 15 are not now before us, and we express no view on their legality.

NBTA responded by proposing to delete reference to declared or released value in those rules.[6] In tariff schedules intended to become effective on February 15, 1977, NBTA modified the rules as follows: Rule 5(a), which prohibits acceptance of shipments exceeding $250 in declared or released value, would prohibit acceptance of shipments exceeding $500 in actual value. Rule 15, which limits transportation of jewelry, watches, and magazines to shipments valued at $50, would prohibit acceptance of such articles entirely.

On February 11, 1977, the Commission, on its own motion, suspended operation of the revised schedules up to and including September 14, 1977, and began an investigation to determine whether the proposed rules were just and reasonable.[7] J.A. at 9–10. NBTA, at the request of the Commission, voluntarily extended the suspension period pending final resolution of this litigation. *Id.* at 279, 281. On October 20, 1977, Division 2 of the Commission decided that NBTA had failed to carry its burden of proving the proposed rules just and reasonable [8] and ordered them cancelled. *Prohibitions & Limitations on Shipments of Articles (Order)*, 355 I.C.C. 793 (1977). The Commission denied NBTA's petition for reconsideration in January 1978. J.A. at 343–

44. NBTA then filed the petition for review now before us.

## II

■ At the outset, we note the limited scope of our review. Both parties agree that the arbitrary and capricious standard governs review of the Commission's order.[9] *See* 5 U.S.C. § 706(2)(A) (1976). Pursuant to that test, a court must affirm the Commission's rational decision, even though "the judges would have handled the matter differently had they been agency members." *Calcutta East Coast of India & East Pakistan/U.S.A. Conference v. FMC*, 130 U.S.App.D.C. 261, 264, 399. F.2d 994, 997 (D.C. Cir. 1968). Accordingly, we examine whether the Commission's determination that NBTA failed to carry the burden of proving that proposed Rules 5 and 15 are just and reasonable is supportable on any rational basis.[10]

### A. Rule 5

NBTA advanced three justifications for Rule 5, as amended. First NBTA argued that transportation of package express by intercity bus is incidental to the transportation of passengers and their baggage and that value limitations are an inherent characteristic of such incidental service. NBTA claims that the case, *Continental Southern Lines Extension—Pup Semitrailers*, 88

6. The Commission accepted for purposes of this case NBTA's contention that a value provision which does not refer to "declared or released" is merely a description of the property to be accepted and not a limitation of liability. Order, 355 I.C.C. at 797.

7. *See* 49 U.S.C.A. §§ 10701, 10521(a) (West pamphlet 1979). *See also* note 10 *infra.*

8. 49 U.S.C.A. § 10708(c) (West pamphlet 1979) places "the burden . . . on the carrier proposing the changed rate, classification, rule, or practice to prove that the change is reasonable."

9. Brief for Petitioner at 29; Brief for Respondents at 13.

10. The Commission argues that the proposed rules violate the duty of a common carrier of property to accept, within the scope of its certificate of authority and the limitations imposed by its equipment, all property safely suscepti-

ble of transportation in the equipment ordinarily used. *See, e. g.,* Transportation Activities of Arrowhead Freight Lines, 63 M.C.C. 573, 575–76 (1955). NBTA contends, however, that bus carriers authorized to provide express service are primarily common carriers of passengers and, as such, are not subject to the obligations of common carriers of property. NBTA asserts that a more liberal standard governs bus carriers that transport express: they "have the right to establish just and reasonable rules specifying the type of traffic they will transport and must accept all commodities only within that realm." Brief for Petitioner at 28. We find the distinction irrelevant in this case. Even assuming that the obligations of common carriers of passengers that transport express are less stringent than those of carriers that exclusively transport property, for reasons we now explain, NBTA, nevertheless, has failed to prove that the proposed rules are "just and reasonable."

M.C.C. 547 (1961), among others,[11] establishes the proposition that value limitations are necessary to ensure that express service remains subordinate to passenger service. Brief for Petitioner at 27.

The Commission found that the incidental nature of bus express service is and has been defined solely in terms of the shipment's quantity, size, volume, or weight, without reference to value. *Order,* 355 I.C.C. at 799. The authorities cited by NBTA, according to the Commission, support this finding. The Commission thus concluded that NBTA had failed to prove its contention that value limitations are an essential component of incidental service.

■ Our review of the case law indicates that the Commission's analysis is reasonable. Although we agree that carriage of express is incidental to the primary responsibility of bus companies to transport passengers, *see Continental Southern Lines Extension—Pup Semitrailers,* 88 M.C.C. at 549–50, we find no precedent indicating that value limitations are necessary to maintain that balance.

The Commission uniformly has defined "incidental" services by focusing on the physical compatibility of express and passenger service. Commission decisions emphasize the volume, weight, size, or method of handling the particular shipments involved.[12] The cases reflect concern that passenger comfort will be inhibited if too many or too large packages are accepted for transport on buses which have limited storage space, and that passenger safety will be jeopardized if goods are improperly stored atop buses or in trailers attached to the rear of buses.[13] The *Continental* case does not mention value, and the concept appears to have been irrelevant not only to that decision, but to other decisions defining "incidental" service as well.[14]

Further, we note that NBTA's own practices do not establish the inherent relationship it claims exists between "incidental" service and value limitations. Although NBTA has consistently restricted the released value of goods accepted for carriage, the actual value of goods has never been limited. Accordingly, a shipper willing to declare the value of a shipment at no more than $250 for purposes of carrier liability has been able to transport goods of any value via bus express. Thus, we agree with the Commission that value limitations are not an essential component of "incidental" service.

---

11. NBTA also relied on Meisinger Stages Common Carrier Application, 1 M.C.C. 471 (1937); Capital Motor Lines Common Carrier Application, 1 M.C.C. 462 (1937); and Emporium v. New York Central R.R., 214 I.C.C. 153 (1936), before the Commission.

12. In Continental Southern Lines Extension—Pup Semitrailers, 88 M.C.C. 547 (1961), the Commission denied the application of a passenger carrier to transport express in semitrailers attached to the rear of passenger buses on the grounds that the trailer presented a safety hazard to passengers, *id.* at 552, and, absent a demonstrated need for the service, it would result in unwarranted competition with interstate carriers of freight, *id.* at 550, 552.

   In Meisinger Stages Common Carrier Application, 1 M.C.C. at 473, the Commission stated that the carriage of express in a vehicle with passengers was to be limited to those shipments of a weight, bulk, and volume that could be transported without "disturbing the comfort and convenience of passengers or interfering with the safety, speed, and other essential qualities of common carrier passenger service."

   Similarly, in Capital Motor Lines Common Carrier Application, 1 M.C.C. at 464, a case involving the transportation of mail in a passenger bus, which NBTA asserts is analogous to express service, the Commission allowed mail carriage only in a manner which "[would] not jeopardize the safety or comfort of the passengers."

13. *See, e. g.,* J.A. at 84 (verified statement of Jerry M. Thielen, Vice President, Package Express, Greyhound Lines, Inc.).

14. *See* note 12 *supra. But cf.* Emporium v. New York Central R.R., 214 I.C.C. 153. In *Emporium,* the Commission held that a railroad carrier's refusal to transport silver or gold was not unlawful. The Commission has long acknowledged that gold and silver, as items of extraordinary value, require highly specialized service. *See generally International Detective Serv., Inc. v. ICC,* 194 U.S.App.D.C. 55, 59, 595 F.2d 862, 866 (D.C. Cir. 1979). The case, accordingly, cannot be said to stand for the general proposition that refusal to transport ordinary commodities in excess of certain value limitations is necessay to maintain "incidental" express service. *See* note 18 *infra.*

NBTA next contends that, absent value limitations on goods accepted for transportation, express service would be financially infeasible. NBTA claims that carrier inability to provide special handling for valuable express could result in shipment damage or loss. NBTA believes that the increase in reimbursement claims which would result if high value goods were carried would either drive carriers out of business entirely or would force them to discontinue express service.

NBTA's argument ignores the carrier's ability to charge rates that either (1) cover the cost of liability for the actual value of a good or (2) allow carriers to limit their liability through the use of released or declared value. Released excess value rates exist specifically to protect carriers following the second course against the financial risks of transporting valuable freight. The Commission, in a 1967 amendment to Released Rates Order No. MC–293, authorized carriers to charge higher rates for transportation of valuable shipments. Under that order, shipments released to a value not exceeding $50 for any shipment of 100 pounds or less, or not exceeding 50 cents per pound actual weight for any shipment over 100 pounds, move under certain basic rates not here in issue. Shipments with declared or released values exceeding these amounts, however, are assessed at the base rate plus 25 cents more for each $100, or

fraction thereof, of declared excess value.[15] J.A. at 242–43. These rates, which are contained in Rule 4 of NBTA's current tariffs, allow carriers to shift the burden of transporting valuable goods to the shippers using the service.[16]

Finally, NBTA argues that passenger safety would be jeopardized by the criminal elements attracted by transportation of valuable property without adequate security. This contention is wholly speculative and unsupported by any evidence on the record.[17] Further, the Commission found no evidence of the feared disruption under the existing Rules 5 and 15, which limit the released values of shipments to $250, but place no ceiling on actual value. The rules presently in effect thus "actually permit acceptance of the very class of traffic [NBTA] now seeks to prohibit." *Order*, 355 I.C.C. at 797.

The Commission also refused to approve Rule 5 on the ground that it could not be uniformly applied and enforced. The Commission explained, "Although the value limitation of rule 5 is fixed and definite insofar as the dollar amount is concerned, it is vague and indefinite as to the articles that would be accepted or prohibited." *Id.* at 798. We agree.

Value, under Rule 5 as proposed, "will be determined by the shipper, who will be asked by the carriers to state the article's

---

**15.** NBTA made no showing that the rates were inadequate to compensate carriers for claim or security costs associated with transporting property valued in excess of $500 actual value. We note, however, that the rates have not been changed since 1967 and may indeed be outdated. If such is the case, NBTA's proper recourse, as the Commission suggests, is to seek modification of the existing released rates order to provide excess value rates commensurate with projected or actual claim and security costs. The financial interests of the carriers are thus fully protected, rendering the proposed tariff restriction unnecessary. See Household Goods Carriers' Bureau v. ICC, 189 U.S.App. D.C. at 291, 584 F.2d at 447 (MacKinnon, J., concurring).

**16.** Carriers could use the additional revenue either to offset the costs of higher reimbursement claims or to provide greater security. NBTA argues, however, and the dissent agrees,

that increased security measures cannot be instituted because they "impede and interfere with unencumbered transportation of passengers." Dissenting op., 198 U.S.App.D.C., at ——, 613 F.2d at 888. We find ample evidence to support the Commission's position that the inconvenience NBTA predicts need not necessarily result. Security devices could be installed, at a minimal cost, which would reasonably protect against theft without unduly disrupting passenger carriage. Express awaiting bus availability in urban areas could be stored, for example, in enclosed areas with lock and key control similar to those recently instituted by Greyhound, Inc. See J.A. at 227–41. In rural areas, express awaiting shipment or pick-up could be placed with little inconvenience in special areas set aside in the building or business operating as the bus terminal.

**17.** *See* note 16 *supra.*

actual value." Brief for Petitioner at 23. Absent an objective standard, carriers could use varying methods to define actual value. Manufacturer's cost, wholesale price, retail price, or invoice price could all form the basis of an actual value determination. Property rejected by one carrier as exceeding $500 actual value based on retail price could be accepted by another based upon wholesale price. The Commission's conclusion that this uncertainty "could create a breeding ground for abuse" by carriers, *Order,* 355 I.C.C. at 798, is reasonable.

### B. Rule 15

■ Under existing Rule 15, bus lines have accepted for transportation jewelry, watches, and magazines not exceeding $50 in declared or released value. Rule 15, as modified, prohibits carriage of these items entirely. NBTA did not justify the exclusion before either the Commission or this court. Accordingly, we affirm the Commission's decision that NBTA failed to carry the burden of .proving Rule 15 just and reasonable. Should NBTA propose a value limitation on these items, analogous to that of Rule 5, the concerns set out in Part II(A) of this opinion would apply with equal force.

### III

For the foregoing reasons, the Commission's determination that NBTA failed to prove that Rules 5 and 15 are just and reasonable is affirmed. In so holding, we do not suggest that bus carriers must transport all items regardless of value. As the Commission noted, "bus carriers of express may adopt just and reasonable tariff restrictions pertaining to specific items of ex-

traordinary value." [18] Brief for Respondent at 34 n.9. We hold only that a rational basis supports the Commission's decision that NBTA failed to prove the reasonableness of rules which limit transportation of ordinary commodities to $500 in value and prohibit entirely transportation of jewelry, watches, and magazines.

*Affirmed.*

WILKEY, Circuit Judge, dissenting:

This case is a wonderful illustration of why many people think transport in the United States should be deregulated and the ICC simply go out of business. The ICC position is uneconomic and unreasonable, therefore "arbitrary and capricious" within the agreed standard of our review.

### I.

All that the bus companies want is to engage in their primary line of activity, carrying passengers. Historically and practically, incidental to the carriage of passengers has been the transportation of baggage and small packages, classified as "express." The bus companies have no desire to be in the freight hauling business; hence, the bus companies are willing to put a limit of actual value of $500 on the express which they accept, and are perfectly willing to leave the business for packages of $501 and upward in value to the licensed motor freight carriers.

The buses are common carriers. The question is: common carriers of what? The buses say they are common carriers of passengers only under old § 208(d) of the Interstate Commerce Act,[1] to which the carriage

18. Articles of extraordinary value refer to items "which clearly have *intrinsic* value, that is: value based on qualities such as rarity, high and consistent marketable monetary worth, and legal usage." Garrett Freight Lines, Inc.— Modification, 106 M.C.C. 390, 398 (1968) (emphasis in original). They generally include precious metals, legal tender, negotiable and non-negotiable instruments, and rare objects. *Id.* at 394. The Commission has distinguished the risks attendant to transportation of ordinary commodities of "high value" from those which accompany carriage of items of "extraordinary

value." For example, the Commission observed in *Garrett Freight Lines* that problems of marketability render items in general commerce less attractive to the potential thief than articles of intrinsic worth. *Id.* at 397–98.

1. " . . . A certificate for the transportation of passengers may include authority to transport in the same vehicle with the passengers, newspapers, baggage of passengers, *express,* or mail, or to transport baggage of passengers in a separate vehicle." Formerly 49 U.S.C. § 308(d), recodified in different language but

of "express" is incidental. It is indicative that the incidental authority to carry express has been granted by the terms of the statute using the word "express," and that is not an incidental authority to carry "property." "Property" is properly shipped by motor freight carriers, which are regulated under old § 216 of the Act.[2]

Historically, the buses have placed limits on the size and weight of the "express" which they would accept, because of the recognized limited space on their vehicles. No objection has ever been raised by the ICC to these limitations. They are clearly limitations of acceptance. Similarly, the buses now wish to place a limit on value, as they always have,[3] because of the limited security facilities of the bus terminals. The ICC has not found that the concern of the buses over the security facilities at their terminals is misplaced.

## II.

My disagreement with my two colleagues is on Rule 5, not Rule 15. The ICC rejected

the proposed modification of Rule 5[4] for basically two reasons: (A) the Commission felt that there was no reason to limit the value of express packages; and (B) even if there should be a limit in value, the proposed rule could not be uniformly applied or enforced.

A. With regard to the first conclusion, giving any weight at all to whose business operation is under consideration, the NBTA has given sufficient reasons justifying a limitation on the value of express packages. First, there is the problem of security. Express traffic is loaded onto buses from busy passenger platforms simultaneously with passenger baggage. This process occurs in reverse at destination points. At both times there is no way of keeping the express (and passenger baggage) separate from passengers and members of the general public. There is also necessarily some period of time during which the express shipments must remain on the busy platforms before they can be moved to interior storage areas.[5] The chances of theft at

without substantive change at 49 U.S.C.A. § 10922(c)(4) (West Pamph. 1979) (emphasis added).

2. *See* former 49 U.S.C. § 316(b), the substantive meaning of which was not changed when the Interstate Commerce Act was revised and recodified (*see* Act of 17 October 1978, Pub.L. No. 95–473, § 3(a), 92 Stat. 1466, recodified at 49 U.S.C.A. §§ 10701, 10702, 11101 (West Pamph. 1979)).

3. I am puzzled by the approach my colleagues take in regard to the concept of *value* in regard to the incidental services provided by passenger carriers. While it may be true that Commission decisions emphasize the volume, weight, size, or method of handling the incidental shipments involved, yet value has always been a component and limiting feature of the passenger carrier's incidental services. As the majority opinion recognizes, the $250 limit for released or declared value has always been a feature associated with the incidental express service. Now the passenger carriers want to limit their acceptance of express to $500 actual value. As a practical business matter, if the carriers want to do this, why shouldn't they?

Apparently the only answer that the ICC and my two colleagues can give is that (1) value has never been discussed in the cases; and (2) value has always been talked of in terms of released or declared value. The argument that

something has never been done before has always seemed to me to be an argument with zero merit, but it is typical of the regulatory mentality. Value, whether actual, released, or declared is admittedly a condition of acceptance. If the passenger carriers only want to be in the business of taking express packages with an actual value of $500 or less, the public is informed of this, and motor freight carriers exist who are eager to carry packages of $501 and upward in value, why shouldn't the passenger carriers be in the business in which they want to engage? The passenger carriers, who presumably know their own business better than the ICC, think this is a reasonable business arrangement consonant with their primary obligations as passenger carriers. Danger or even inconvenience to the public is nonexistent, particularly when the motor freight carriers are available, and only the regulatory mentality would deny the passenger carriers their desired reasonable method of handling express packages.

4. Consequently, Rule 5 would read, "No single Shipment will be accepted for transportation which exceeds five hundred ($500.00) dollars in Value . . . ." The parties agree that the term "Value" means actual value.

5. Likewise, express is carried on a space-available basis, and if passenger baggage has taken all the space on a particular bus, the express

these various points are obvious, and are only increased and accentuated as the value of the packages transported increases, and as more criminals are attracted by this higher-value cargo. Additionally, as the chances of theft increase, there is enhanced risk to passengers of being harmed either as a theft is taking place, or as an owner or officer of the law is attempting to apprehend a thief.

These security problems exist at all bus terminals, but are particularly acute at those bus stops operated by commission agents, who in fact operate the vast majority of bus stops.[6] Commission agents are independent businessmen who generally operate a bus stop as a sideline to their principal occupation. As such they cannot become as involved as a full-time employee, and can only devote a portion of their time and attention to their bus business. It is hard to believe these people would be able to provide the type of security which would be required if items of unlimited value were carried in express service.

The carriage of express by passenger buses is in contrast to the business of freight carriers. These carriers may operate behind fences, steel doors, and barbed wire, and may lawfully exclude from their premises members of the general public—an option not available to passenger carriers.

Secondly, a rule requiring buses to carry express without limit as to value would tend to prevent the bus lines from maintaining express service as merely "incidental" to passenger service. As the Commission has held, carriage of express by intercity buses is intended to remain subordinate to the carriage of passengers, and should not be allowed to interfere with or become a burden upon passenger service.[7] If ex-

press of unlimited value were carried, no doubt there would have to be special handling and hand-to-hand documentation, which would tend to interfere with and delay scheduled passenger service. Likewise, increased security measures such as fences and gates would impede and interfere with the unencumbered transportation of passengers. This cannot be the result desired by either the Commission or the bus lines.

The Commission has argued, and my colleagues agree, that if the passenger carriers are concerned that carriage of higher-value parcels will result in higher costs for claims and security, they can simply raise the rates applicable to those parcels. There are several responses to this argument. First, as has just been pointed out, the increased security measures and special handling required would tend to interfere with passenger service and prevent the express service from being maintained, as required, as "incidental" to passenger service. Secondly, there is no Commission finding of the economic consequences, if the rates were increased sufficiently to cover increased security and liability costs. Presumably the bus lines have evaluated the possible revenues and costs, and their business judgment is that the carriage of high value express cannot be worth the extra expense. Finally, in any event, increasing the applicable rates would not eliminate the enhanced risk to passengers from increased levels of criminal activity at bus terminals. Compensation for losses due to crime rarely is preferable to avoiding the crime itself. It is a commentary on the Commission's logic that it seems to reason the opposite.

must wait, with the consequent sitting and movement back and forth to a storage area.

6. See J.A. at 90–91, where Greyhound Lines, Inc., indicates that in 1976, 2,215 of its 2,352 regular route bus facilities were operated by commission agents. (The remainder were carrier-operated.) Greyhound indicates that these commission agents engaged in the following businesses: 291—service stations, 232—restaurants, 164—drug stores, 140—grocery/variety stores, 126—hotels or motels, 44—taxicab stands, 30—newspaper stands, 26—travel agencies, 14—auto parts, 9—dry cleaners, 8—feed stores, 7—hobby shops, 5—post offices, 4—barber shops, etc.

7. See Continental Southern Lines, Inc., Ext.—Pup Semitrailers, 88 M.C.C. 547, 549–50 (1961), wherein the Commission was interpreting what is currently 49 U.S.C.A. § 10922(c)(4) (West Pamph. 1979).

In addition to the possibility of raising rates, my colleagues add the suggestion that the bus lines could "limit their liability through the use of released or declared value."[8] First, this does not confront the danger and undesirability of enhancing platform pilferage. Second, this ignores the fundamental position of the bus lines: they are in the passenger carrying business, not that of carrying "property." "Express" is, and statutorily is supposed to be, strictly a sideline; the bus lines don't want to carry high value express for several good reasons, whether their liability is limited by released or declared value or not. And, why should the bus lines be compelled to do so? The Commission has no answer to this.

In contrast, the bus lines point out, correctly, that there is a statutory basis for their position that the goods which they carry may be limited as to value. 49 U.S.C.A. § 10922(c)(4) (West Pamph. 1979)[9] states that "a certificate . . . to transport passengers may include authority to transport . . . *express* . . .." (emphasis added). Congress specifically used the term "express" rather than the broader and more inclusive term "property" to describe what the bus lines could carry. The term "property" was used to describe what the freight lines would carry.[10] Since the term "express" has historically referred to parcels of small size, weight, and value, the use by Congress of that term, rather than the broader term "property," is strong support for their argument, with which I agree, that bus lines may not be forced to carry parcels of unlimited value.

In a related argument, the Commission claims that bus lines have the same common carrier duties, with regard to goods carried, as freight lines.[11] Although not articulated, the Commission seems to believe that this duty arises out of former § 216(b) of the Interstate Commerce Act.[12] The bus lines reply that their common carrier duties arise instead out of former § 216(a) of that Act.[13] It seems clear that the bus lines are correct on this point.

B. The Commission contends that, even if there should be a limit on value, the proposed rule could not be uniformly applied or enforced. It states that under the proposed rule the value of a specific shipment could be determined differently by different carriers, depending upon whether manufacturer's cost, wholesale price, retail price, invoice price, or even agreed value were used. The response of petitioner's brief is a practical answer:

> [T]he value of an article to be accepted for transportation will be determined by the shipper, who will be asked by the carriers to state the article's actual value. If the value exceeds $500.00, the article will be refused, and, if it does not exceed $500.00, it will be accepted.

As is pointed out by petitioner,[14] this has been the traditional method for determining value. There is no reason why it cannot continue to operate in the future, if it has in the past, despite my colleagues' expressed yearning for "an objective standard."[15]

---

**8.** Majority op. —— of 198 U.S.App.D.C., 884 of 613 F.2d.

**9.** Formerly 49 U.S.C. § 308(d), which was § 208(d) of the Interstate Commerce Act.

**10.** *See* former 49 U.S.C. § 316(b), the substantive meaning of which was not changed when the Interstate Commerce Act was revised and recodified (*see* Act of 17 Oct. 1978, Pub.L. No. 95–473, § 3(a), 92 Stat. 1466).

**11.** *See* Joint Brief for Respondents at 30–31.

**12.** 49 U.S.C. § 316(b) (repealed by Act of 17 Oct. 1978, Pub.L. No.95–473, § 4(b), 92 Stat. 1466, replaced by 49 U.S.C.A. §§ 10701, 10702, 11101 (West Pamph. 1979)).

**13.** 49 U.S.C. § 316(a) (repealed by Act of 17 Oct. 1978, Pub.L. No.95–473, § 4(b), 92 Stat. 1466, replaced by 49 U.S.C.A. §§ 10701–10703, 11101 (West Pamph. 1979)).

**14.** Brief for Petitioner at 23.

**15.** Majority op. —— of 198 U.S.App.D.C., 886 of 613 F.2d. What the carriers and their customers have found practical in the past in regard to valuation doubtless will be practical in the future. At all events, if the Commission's rejection of the filed tariff stands, as the majority opinion so affirms, the carriers will be right back to their "unobjective standard" of valuation which they have been applying these many years.

### III.

The ultimate question here is whether the particular tariff provision is reasonable.[16] In an excess of regulatory zeal, the ICC has said No, the bus lines have never placed acceptance of express packages on the basis of actual value, so they can't do it now; and, our ICC decisions have never talked about "value" as related to express, (even though the carriers have used it), so they can't use "value" as a condition of acceptance now; and, even though the bus lines are authorized as passenger carriers, not property carriers, with only incidental authority to carry "express," the ICC can compel the passenger carriers to carry express of unlimited value.

To my mind all of this is wrong and has no relevance to whether the tariff provision is reasonable. The ICC has acted arbitrarily and capriciously in asserting its purported regulatory authority, when it could have performed its public function much better by accepting the bus lines' determination of what express they could carry incidental to their passenger business, and thus let the bus lines get on with improving their passenger service without an extraneous burden being thrust upon them. I respectfully dissent.

---

**16.** *See* 49 U.S.C.A. §§ 10701(a), 11101 (West Pamph. 1979) and the statutory sections from which these sections are derived (*i.e.,* old 49 U.S.C. §§ 316(a) and (b)). As noted above, the new Interstate Commerce Act was not intended to effect a substantive change in the old Interstate Commerce Act. *See* Act of 17 Oct. 1978, Pub.L. No. 95–473, § 3(a), 92 Stat. 1466.