**FLYING TIGER LINE, INC.**

v.

**PINTO TRUCKING SERVICE, INC.**

Civ. A. No. 80–2583.

United States District Court,
E. D. Pennsylvania.

July 6, 1981.

James W. Patterson, Harper, George, Buchanan & Driver, Philadelphia, Pa., Peter R. Reilly, Thompson, Hine & Flory, Washington, D. C., for plaintiff.

Miles A. Jellinek, Cozen, Begier & O'Connor, Philadelphia, Pa., for defendant.

SUR PLEADINGS AND PROOF

LUONGO, District Judge.

Plaintiff, Flying Tiger Line, Inc. (FTL) brought this action to recover $37,722.12 pursuant to the Carmack Amendment. 49 U.S.C. § 11707. This sum represents the amount FTL was required to pay for the repair of a jet engine damaged in transit by defendant Pinto Trucking Service, Inc. (Pinto). Pinto concedes responsibility for the damage to the engine, but contends that it effectively limited its liability to the sum of $2,079.50, the released rate value of the engine. 49 U.S.C. § 10730.

In lieu of a trial the parties have submitted the case to me on stipulated facts.* In resolving this case I have considered the stipulated facts, the pleadings, written submissions and oral presentations of the parties.

## I. JOINT STIPULATION OF FACTS

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1337, since it arises under an Act of Congress regulating commerce, i. e., Section 11707 of the Revised Interstate Commerce Act, 49 U.S.C. § 11707 [formerly Section 20(11) of the Interstate Commerce Act, 49 U.S.C. § 20(11)] and the amount in controversy exceeds $10,-000, exclusive of interest and costs.

2. Plaintiff, Flying Tiger Line, Inc., is a Delaware Corporation with its principal place of business at 7401 World Way West, P.O. Box 92935, Los Angeles, California 90009. FTL is a common carrier operating in interstate commerce.

3. Defendant, Pinto Trucking Service, Inc., is a Pennsylvania corporation with its principal place of business at 1414 Calcon Hook Road, Sharon Hill, Pennsylvania 19079. Pinto is a common carrier operating in interstate commerce.

4. On or about February 16, 1979, FTL tendered three new jet aircraft engines to Pinto at Bradley International Airport, Windsor Locks, Connecticut, for common carrier motor transportation and delivery to FTL at JFK International Airport, Jamaica, New York. (Attachment to Joint Stipulation 1)

5. The face of the bill of lading for this transportation issued to FTL by Pinto, Pinto Airbill Number 26–12885 dated February 16, 1979, contains printing acknowledging receipt of "the property described below, in apparent good order, except as noted . . ." and no such exceptions are noted thereon. (Attachment to Joint Stipulation 1)

6. The applicable FTL Trucking Manifest contains a similar pre-printed state-

ment: "Rec'd above shipments in good order except as noted in the exceptions column." This statement was signed by Pinto's driver and again no exceptions were noted. (Attachment to Joint Stipulation 2)

7. The face of the bill of lading also contains the typed notation "EXCLU. USE TRK. O/W, BDL/JFK" in its printed Special Services Requested box. (Attachment to Joint Stipulation 1)

8. The face of the bill of lading contains red printing which states:

"Unless a Greater Value is Declared Herein, the Shipper Agrees and Declares that the Value of the Property is Released to an Amount Not Exceeding $50 for Any Shipment of 100 Pounds or Less and Not Exceeding 50 Cents Per Pound for Shipments Weighing in Excess of 100 Pounds."

(Attachment to Joint Stipulation 1)

9. FTL declared no "Greater Value."

10. The face of the bill of lading also contains printing which states that the shipment is "RECEIVED, subject to the classifications and tariffs in effect on the date of the issue of this Bill of Lading." (Attachment to Joint Stipulation 1)

11. After the engines had been loaded on the Pinto truck and the truck had moved only a short distance from the FTL loading dock, one of the three jet engines fell from it sustaining damage.

12. The engine was repaired by the manufacturer, the Pratt & Whitney Aircraft Group.

13. On February 25, 1980, FTL, which had common carrier responsibility for the engine to the owner of the engine, the Boeing Company ("Boeing"), paid Boeing $37,722.12 in repair damage costs. (Attachment to Joint Stipulation 3)

14. On August 22, 1979, FTL filed written notice of claim for damages with Pinto. (Attachment to Joint Stipulation 4)

---

* Initially, plaintiff filed a motion for summary judgment on stipulated facts. The parties, however, have since stipulated that the motion for summary judgment is withdrawn and that the case shall proceed as a non-jury trial on stipulated facts.

15. On January 21, 1980, Pinto forwarded two checks in response to FTL's claim in the total amount of $2,079.50, representing 50 cents per pound times the weight of the damaged engine, 4,159 pounds. (Attachment to Joint Stipulation 5) FTL has not negotiated these checks.

16. Pinto has conceded responsibility for the damages which occurred to the engine but, relying on the released rate provisions of its tariff and the above-mentioned bill of lading, has refused to pay any additional money in satisfaction of FTL's claim. (Attachment to Joint Stipulation 5)

17. The released rate provision of the Pinto tariff in effect at the time of the accident, Pinto Freight Tariff MF–ICC 46, as amended (Attachment to Joint Stipulation 6) was authorized by the Interstate Commerce Commission (ICC) in Released Rates Order No. MC–638 of October 12, 1965. (Attachment to Joint Stipulation 7) The Order was issued in response to a released rate application filed by the National Motor Freight Traffic Association, Inc. (Attachment to Joint Stipulation 8)

18. Pinto Freight Tariff MF–ICC 46 contains, in item 160, a released rate provision authorized by Released Rate Order No. MC–638. (Attachment to Joint Stipulation 6)

19. Pinto Local and Joint Motor Freight Tariff, MF–ICC 74, as amended, was also in effect at the time of the accident. (Attachment to Joint Stipulation 9)

20. Both Pinto Tariffs contain exclusive use provisions, MF–ICC 46 at Item 70 and MF–ICC 74 at Item 55.

21. Pinto holds motor carrier authority from the ICC which is not restricted to the transportation of shipments having a prior or subsequent movement by air.

22. The deregulation of air cargo was effective on November 9, 1977. 49 U.S.C. § 1388.

## DISCUSSION

Since Pinto has conceded responsibility for the damage to the jet engine (Joint Stipulation of Fact 16), the sole issue to be resolved is whether Pinto effectively limited its liability to the jet engine's released rate value [1] pursuant to 49 U.S.C. § 10730. FTL contends that Pinto's authority to limit its liability did not apply to the "exclusive use of vehicle rate" Pinto charged in the instant case.

Pursuant to 49 U.S.C. § 11707, which recodified the Carmack Amendment (formerly 49 U.S.C. § 20(11)) without substantive change, a carrier is liable for the actual loss or injury to property caused by it, *see Missouri Pacific Railroad Company v. Elmore & Stahl*, 377 U.S. 134, 137, 84 S.Ct. 1142, 1144, 12 L.Ed.2d 194 (1964); *Howe v. Allied Van Lines, Inc.*, 622 F.2d 1147, 1157 (3d Cir. 1980), but § 11707(c)(4) provides that "[a] common carrier may limit its liability for loss or injury of property" pursuant to 49 U.S.C. § 10730.

▮ At the time the incident giving rise to this action occurred 49 U.S.C. § 10730 (West Pamphlet 1980) [2] provided,

---

1. Released value is the value agreed upon by the shipper and carrier. It is distinguished from the declared value of an article which is the value assigned by the shipper and the actual value which "generally refers to the market price or replacement cost of the item." *National Business Traffic Association, Inc. v. I.C.C.*, 613 F.2d 881, 882 (D.C.Cir.1979).

2. Congress amended 49 U.S.C. § 10730 effective July 1, 1980, to permit motor carriers to charge released rates upon written agreement without first obtaining authorization from the Commission. Motor Carriers Act of 1980, Act of July 1, 1980, Pub.L.No.96–296 § 12, 94 Stat. 793. Despite the fact that a court is generally to apply the law as it exists at the time it

considers a controversy, *Bradley v. School Board of the City of Richmond*, 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974), both parties have argued this case under the old statute, and their position appears to be correct. An exception to the general rule is that a court should not apply a change in law if the legislative history is to the contrary or if manifest injustice would result. *Id.* Further, "in mere private cases between individuals, a court will and ought to struggle hard against a construction which will, by a retrospective operation, affect the rights of the parties...." *United States v. Schooner PEGGY*, 5 U.S. [1 Cranch] 103, 110, 2 L.Ed. 49 (1801).

The Interstate Commerce Commission may require or authorize a carrier providing transportation or service subject to its jurisdiction under subchapter I, II, or IV of chapter 105 of this title, to establish rates for transportation of property under which the liability of the carrier for that property is limited to a value established by written declaration of the shipper, or by a written agreement, when that value would be reasonable under the circumstances surrounding the transportation. A rate may be made applicable under this section to livestock only if the livestock is valuable chiefly for breeding, racing, show purposes, or other special uses. A tariff filed with the Commission under subchapter IV of this chapter shall refer specifically to the action of the Commission under this section.

*Id.*

Under this section "carriers may limit their liability to the declared or released value of the shipment only if they charge lower rates specifically approved by the" Interstate Commerce Commission (ICC), *National Bus Traffic Association, Inc. v. ICC,* 613 F.2d 881, 882, n.5 (D.C.Cir.1979), and obtain the shipper's agreement in writing to the declared or released value. *Anton v. Greyhound Van Lines, Inc.,* 591 F.2d 103, 107 (1st Cir. 1978). *See generally, Howe v. Allied Van Lines, Inc.,* 622 F.2d 1147, 1158–1159 (3d Cir. 1980). The shipper must be given the choice to increase its liability protection by paying a higher rate for the transportation. *Anton v. Greyhound Lines, Inc., supra,* 591 F.2d 108.

██ Because the public policy as contained in the Carmack Amendment is to hold carriers (in this case Pinto) liable for the actual injury to goods shipped, arrange-

ments attempting to limit liability will be strictly construed against the carrier. *See, e. g., Anton v. Greyhound Van Lines, Inc., supra,* 591 F.2d at 109; *Chandler v. Aero Mayflower Transit Company,* 374 F.2d 129, 135 (4th Cir. 1967). Accordingly, the carrier has the burden of establishing that its liability is limited. *Thomas Electronics Incorporated v. H. W. Taynton Company,* 277 F.Supp. 639, 643 (M.D.Pa.1967).

██ Pinto contends that the ICC authorized it to provide for released rates for transportation such as that rendered in the instant case, that its tariff on file with the ICC revealed that the released rates would apply, and that, by accepting the bill of lading without declaring a greater value for the engine, FTL agreed to the released rate liability. FTL contends that Pinto was authorized to limit its liability solely in conjunction with commodity rates and that therefore the released rate provision in Pinto's tariff does not apply to the "exclusive use of vehicle rate" charged in the instant case. (Joint Stipulation of Fact 7).

Although FTL is correct in claiming that the ICC authorized Pinto to limit its liability solely in conjunction with commodity rates, *see* Released Rates Order No. MC–638, a plain reading of Pinto's tariffs on file with the ICC indicates that the "exclusive use of vehicle rates" stated therein are, indeed, commodity rates.

Pursuant to the regulations promulgated by the ICC, a commodity rate:

> means a rate published to apply on a commodity or commodities which are specifically named or described in the tariff in which the rate is published or in a separate commodity list. "Commodity tariffs" are those which contain commodity rates.

In enacting § 12 to the Motor Carriers Act of 1980, Congress' purpose was to encourage competition in the pricing of transportation by "increasing the range of choices available to the shipping public." H.R.No.96–1069, 96th Cong., 2d Sess., *reprinted in* [1980] U.S.Code Cong. & Ad.News 2283, 2309–2310. It does not appear, therefore, that Congress intended to interfere with existing contracts which were entered into under the terms of the old statute. Clearly, the pro-competitive purposes of the Act would not be furthered by retroactive application. Accordingly, I will consider this case under 49 U.S.C. § 10730 as it existed prior to its amendment by the Motor Carriers Act.

49 C.F.R. § 1310.0(f)(9) (1980).[3] It is a rate "made specifically applicable for the carriage of a particular commodity or group of commodities from one designated point to another." *All States Freight, Inc. v. New York, New Haven & Hartford Railroad Co.*, 379 U.S. 343, 345, 85 S.Ct. 419, 420, 13 L.Ed.2d 324 (1964).

Pinto's tariff MF–ICC 74 (Attachment 9 to Joint Stipulation of Facts) sets forth rates that are applicable to " 'Freight, All Kinds' on Shipments Having A Prior or Subsequent Movement by Air or Moving in a Substitute Motor for Air Service." It is clear that "freight, all kinds" rates are commodities rates. *See, e. g.*, 49 C.F.R. § 1310.-0(7) (1980) ("freight, all kinds," rate applies to commodities or articles in general). *See, also*, 49 C.F.R. § 1310.7(g)(2) (1980). Plaintiff's argument that the "exclusive use of vehicle rate" as stated in Pinto's tariff is not a commodity rate because it was not "applicable to any particular commodity or group of commodities" is, therefore, not persuasive. In tariff MF–ICC 74 the exclusive use of vehicle rate was applicable to "freight, all kinds." The title page of the tariff so states as does the title page of all of the sections of the remainder of the tariff.

In construing a tariff a court should avoid a construction which would create an ambiguity where none exists. *See Quaker State Oil Refining Corporation v. United States*, 465 F.Supp. 75, 78 (W.D.Pa.1979). Plaintiff's position would require me to create an ambiguity. As stated in tariff MF–ICC 74, the "exclusive use of vehicle rate" is unambiguously applicable to "a particular commodity or group of commodities," namely "freight, all kinds."

The fact that Pinto charged more for the exclusive use of its vehicles does not change the fact that the rate charged was for the shipment of "freight, all kinds." The pre-mium charged was for the additional service rendered by Pinto in not mixing the goods FTL shipped with goods shipped by other companies. *See, e. g., Campbell "66" Express, Inc. v. United States*, 302 F.2d 270, 271, 157 Ct.Cl. 365 (1962); *Garrett Freight Lines, Inc. v. United States*, 236 F.Supp. 594 (D.Idaho 1964). The separate listing of exclusive use of vehicle rates simply reflects the basic commodity rate that a shipper would have to pay for that service.

The ICC regulations recognize the service nature of "exclusive use of vehicle rates" and that they are not a distinct type of rate as are commodity or class rates. *See* 49 C.F.R. § 1310(7)(i)(6) & § 1310.7(r). 49 C.F.R. § 1310.7(r) provides in pertinent part:

(r) *Statement required when classification basis exceeded.* It is a principle of longstanding that classification classes or ratings and rules, together with the class rates governed thereby, generally provide the highest rates and charges which an article should bear. It follows that any tariff provision (*e. g.* exceptions rating, commodity rate, charge, rule, et cetera) the application of which in any case would result in a higher charge than otherwise would result from application of the classification class or rating and rules to the class rates would require special justification. Therefore, accompanying the tender to the Commission of a tariff, supplement, or looseleaf page which names such a tariff provision, there shall be a clear statement by the publishing motor common carrier or agent of the justification relied upon to warrant the higher charges. Any such publication not accompanied by a statement of justification shall be subject to rejection. This paragraph does not apply (1) in connection with minimum charges for small shipments (provided they are based on weights not over 500 pounds), (2) *with*

---

**3.** Commodity rates are distinguished from class rates which are rates "which appl[y] on any one or more of various articles according to the class or rating to which they are assigned . . . ." 49 C.F.R. § 1310.0(7). The charge lev-ied under a class rate is "based upon the commodity's particular characteristics." *All States Freight, Inc. v. New York, New Haven & Hartford Railroad Company*, 379 U.S. 343, 345, 85 S.Ct. 419, 421, 13 L.Ed.2d 324 (1964).

respect to publication of rates and provisions for a special service which under the tariff the shipper has the option of using by requesting it in writing (e. g., expedited service, exclusive use of vehicle, et cetera . . . .

*Id.* (Emphasis added).

Additionally, ICC Released Rates Order MC–638 permits carriers to make changes in rates for special services offered by them to shippers. The order states:

"*It is further ordered,* that changes may be made in any rate, or packing specification established under authority of this order, but no change may be made in the released value upon which the rates are dependent. . . ."

*Id.* (Emphasis supplied by the ICC).

Accordingly, Pinto has established that the ICC authorized it to limit its liability to released rate valuations when charging an exclusive use of vehicle rate and that its tariffs on file with the ICC so indicated. It is apparent that such rates are commodity rates which reflect the premium charged for additional service.

Pinto has also established that FTL agreed in writing to Pinto's limited liability for damage to the jet engine as required by 49 U.S.C. § 10730.

The requirement of a written agreement ensures that the shipper is making an "absolute, deliberate and well-informed choice" to accept released rate valuation in exchange for lower rates charged by the carrier. The shipper, however, is charged with knowledge of the "terms, conditions, and regulations contained in the tariff schedule pertaining to a carrier's liability which in turn affect the rates charged the carriage of goods." *Anton v. Greyhound Van Lines, Inc., supra,* 591 F.2d at 108.

The bill of lading which FTL accepted states:

"Unless a Greater Value is Declared Herein, the Shipper Agrees and Declares that the Value of the Property is Released to an Amount Not Exceeding $50 for Any Shipment of 100 Pounds or Less and Not Exceeding 50 Cents Per Pound for Shipments Weighing in Excess of 100 Pounds."

(Attachment 1 to Joint Stipulation of Facts)

When a shipper releases its goods and accepts a bill of lading, the bill of lading constitutes the written agreement of the parties. *American Railway Express Company v. Lindenburg,* 260 U.S. 584, 591, 43 S.Ct. 206, 209, 67 L.Ed. 414 (1922). *See Rhoades Incorporated v. United Air Lines, Inc.,* 340 F.2d 481, 486 (3d Cir. 1965). It is not essential that the shipper sign the bill of lading in order to satisfy the written agreement requirement of 49 U.S.C. § 10730. *See, e. g., American Railway Express Company v. Lindenburg, supra,* 260 U.S. at 591, 43 S.Ct. at 209; *Anton v. Greyhound Van Lines, Inc., supra,* 591 F.2d at 107; *Caten v. Salt City Movers & Storage Co.,* 149 F.2d 428, 432 (2d Cir. 1945). By accepting the bill of lading in the instant case, with its clear statement of released rate valuation of the goods, and by not declaring a greater value FTL agreed to the terms contained therein. FTL did not increase its liability coverage by paying the premium for exclusive use of the vehicle. A party who secures such a service does so to lessen the chance that its goods will be damaged at all. *See Campbell "66" Express, Inc. v. United States,* 302 F.2d 270, 271, 157 Ct.Cl. 365 (1962). If FTL wanted to decrease its liability exposure it could have done so simply by declaring a greater value. It cannot at this late date shift the consequences of its choice onto Pinto which did what was required of it to limit its liability. Pinto, therefore, has met its burden under 49 U.S.C. § 10730 of establishing that it effectively limited its liability for the damage to the jet engine's released value which was $2,079.50.

■ FTL also argues that even if I find that Pinto's liability is limited under 49 U.S.C. § 10730, it is still entitled to judgment in the full amount. It contends that at the time FTL and Pinto entered into the contract at issue there was no longer a rational basis for Released Rates Order MC–638. FTL correctly claims that the

purpose of the Released Rates Order is to allow motor carriers which transport goods having immediate prior or subsequent air travel to have the same released rate liability as the air carriers involved in that traffic. *See* Attachment 8 to Joint Stipulation of Facts. According to FTL, once Congress deregulated air cargo on November 9, 1977, *see* 49 U.S.C. § 1388, the rationale for Released Rates Order MC–638 ceased to exist.

Although neither party has raised the point, I note *mea sponte*, that I lack jurisdiction to consider this issue. Congress has stated that "[a]n order of the Commission remains in effect under its own terms or until suspended." 49 U.S.C. § 10324. Plaintiff's argument would clearly require me to suspend the Released Rates Order of the Commission, but, 28 U.S.C. § 2321(a) provides:

> "Except as otherwise provided by an Act of Congress, a proceeding to enjoin, suspend, in whole or in part, a rule, regulation, or order of the Interstate Commerce Commission shall be brought in the court of appeals. . . ."

"This statutory review procedure must be adhered to so long as the practical effect of a successful suit would contradict or countermand a Commission order." *B.F. Goodrich Company v. Northwest Industries, Inc.*, 424 F.2d 1349, 1353–1354 (3d Cir. 1970). Accordingly, I lack jurisdiction to consider plaintiff's challenge to the continuing validity of the Released Rates Order.

In conclusion, Pinto has established that it is entitled by law to have its liability for damage to the jet engine limited to $2,079.50. Judgment in FTL's favor will be entered in that amount.

### III. CONCLUSIONS OF LAW

1. Jurisdiction over this action is pursuant to 28 U.S.C. § 1337.

2. Defendant, Pinto Trucking Service, Inc., is responsible for the damage caused to the jet engine that it was transporting for plaintiff, Flying Tiger Line, Inc., on February 16, 1979. (Joint Stipulation of Facts 16)

3. Defendant effectively limited its liability to the sum of $2,079.50 which is the released rate value of the jet engine. 49 U.S.C. § 10730.

(a) The Interstate Commerce Commission authorized the use of released rate valuation for the transportation supplied by Pinto, and Pinto's tariffs so reflected.

(b) FTL assented to the released rate valuation assessed by Pinto.

4. Plaintiff is entitled to judgment in its favor against Pinto Trucking Service, Inc. in the amount of $2,079.50.